UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

SECURITIES AND EXCHANGE COMMISSION,         )
                                            )
            Plaintiff,                      )
                                            )
v.                                          )
                                            )
TRADE-LLC,                                  )
PHILIP W. MILTON, and                       )
WILLIAM H. CENTER,                          )
                                            )
            Defendants,                     )
                                            )
BD LLC,                                     )
TWTT-LLC,                                   )
and CMJ CAPITAL LLC,                        )
                                            )
            Relief Defendants.              )
_____)

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows:

## INTRODUCTION

1. Between May 2007 and July 2009, Defendants Philip Milton and William H. Center misappropriated investor funds by running a Ponzi scheme involving Trade-LLC, an unregistered investment adviser and broker-dealer they operated in Palm Beach Gardens, Florida. The Defendants fueled this Ponzi scheme by reporting to investors they had made outlandish returns of up to 8% a month or approximately 100% a year.

2. From this scheme, they raised at least $27.7 million from investors and misrepresented to them that Trade was generating profits by trading securities and commodity futures on their behalf. Based on the Defendants claims that they were generating trading

profits, they paid themselves more than $9 million in salaries, purported expenses, and to finance other unrelated business ventures and paid more than $1 million to investors on so called profits.

3. However in reality, the trading profits were illusory. The Defendants actually lost more than $2 million trading and the so called profits being returned to investors were in reality funds from other investors. In addition, the Defendants misappropriated the more than $9 million of investors' funds they paid themselves.

4. By engaging in this conduct, the Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 (Advisers Act"), 15 U.S.C. §§ 80b-6(1) and 80b-6(2). In addition, Center violated Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a)(1), and aided and abetted violations by Trade and Milton of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2). Unless enjoined, the Defendants are reasonably likely to engage in future violations of the federal securities laws.

## DEFENDANTS AND RELIEF DEFENDANTS

**A.  Defendants**

5. **Trade** is a Florida limited liability company with its principal place of business in Palm Beach Gardens, Florida. From May 2007 to July 2009, Trade operated as an unregistered investment adviser and broker-dealer. Milton and Center both have an ownership interest in the company and directed Trade's day-to-day operations.

6. **Milton**, age 62, resides in Palm Beach Gardens, Florida. He has been a managing member of Trade since May 2007.

7. **Center**, age 64, resides in Richmond, Virginia. He acted as a managing member of Trade since May 2007.

B. **Relief Defendants**

8. **BD LLC** is a Florida limited liability company with its principal place of business in Palm Beach Gardens, Florida. Milton, Center and another individual are managing members of BD. The company purports to appraise underground resources, such as oil and gas. Without any legitimate basis, BD received proceeds from the Defendants' securities fraud and investors' funds.

9. **TWTT-LLC** is a Florida limited liability company with its principal place of business in Palm Beach Gardens, Florida. Milton, Center and two other individuals are managing members of TWTT. The company purports to publish a Website with general investment information. Without any legitimate basis, TWTT received proceeds from the Defendants' securities fraud and investors' funds.

10. **CMJ Capital LLC** is a Florida limited liability company with its principal place of business in Palm Beach Gardens, Florida. Milton, Center and two other individuals are managing members of CMJ Capital. The company purports to provide venture capital to start-up companies and other businesses. Without any legitimate basis, CMJ Capital LLC received proceeds from the Defendants' securities fraud and investors' funds.

**JURISDICTION AND VENUE**

11. The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.

12. The Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of Florida. Trade and the Relief Defendants maintained their principal

place of business in the District, and the Defendants undertook numerous acts in the District that constitute the violations of the federal securities laws set forth in this Complaint. Milton also resides in the District.

13. The Defendants, directly or indirectly, made use of the means or instruments of interstate commerce, or the means or instruments of transportation and communication in interstate commerce and the mails in connection with the acts, practices, and courses of business set forth in this Complaint.

## THE DEFENDANTS' INVESTMENT ADVISORY AND BROKERAGE BUSINESS

14. In May 2007, Milton, Center and another individual organized Trade to (1) market and sell a computer software program for buying and selling securities on an intraday basis that Milton had purportedly developed; and (2) to use the program to trade on behalf of clients.

15. Milton, Center and another individual established Trade's principal offices in South Florida. They also established a Trade office in Virginia.

16. Milton maintained an office in Trade's Florida office. Center maintained an office in Trade's Virginia office. This office was known as the Marketing and Sales Office. Center traveled regularly to Trade's offices in Florida.

17. Milton and Center directed Trade's day-to-day operations. They made business decisions jointly and shared supervisory responsibilities.

18. Between May 2007 and July 2009, three private investment clubs --- Cash Flow Financial LLC, New Life Club LLC, and DC Advisors LLC (collectively the "Clubs") --- invested funds with Trade.

19. Milton and Center solicited the Clubs to invest their funds with Trade by, among other things, falsely representing to them that Milton was an experienced trader who had generated significant profits for himself and others using the computer software trading program he had purportedly developed.

20. Trade entered into written agreements with each of the Clubs or their principals that outlined the investment advisory and brokerage services Trade would provide. Center and another individual signed the service agreements on behalf of Trade.

21. The "Service Agreement – General Fund" that Trade entered into with New Life on January 9, 2009, was signed by Center and provided Trade would: (a) provide professional asset management services; (b) New Life would remit funds to Trade's general investment account for investment in various vehicles Trade chose; and (c) invest New Life's funds with the target of making the following net monthly gains on a monthly basis on the principal investment amounts specified below:

|    | Principal Amount | Net Monthly Gain |
|----|------------------|------------------|
| a. | $500,000 to $999,9999 | 3.00% |
| b. | $1,000,000 to $1,249,999 | 4.00% |
| c. | $1,250,000 to $1,499,999 | 4.50% |
| d. | $1,500,000 to $1,749,999 | 5.00% |
| e. | $1,750,000 to $1,999,999 | 5.50% |
| f. | $2,000,000 to $2,249,999 | 6.00% |
| g. | $2,250,000 to $2,499,999 | 6.50% |
| h. | $2,500,000 to $2,749,999 | 7.00% |
| i. | $2,750,000 to $2,999,999 | 7.50% |
| j. | $3,000,000 and above | 8.00% |

22. Moreover, the "Service Agreement – General Fund" Trade entered into with DC Advisors on January 7, 2009, was signed by Center and provided that Trade would: (a) provide professional asset management services; (b) DC Advisors would remit funds to Trade's general investment account for investment in various vehicles Trade chose; and (c) invest DC Advisors'

funds with the target of making the following net monthly gains on a monthly basis on the principal investment amounts specified below:

| | Principal Amount | Net Monthly Gain |
|---|---|---|
| a. | $500,000 to $999,9999 | 3.00% |
| b. | $1,000,000 to $1,499,999 | 4.00% |
| c. | $1,500,000 to $1,999,999 | 5.00% |
| d. | $2,000,000 and above | 6.00% |

23.  Under the service agreements, Trade was supposed to be compensated for its services if the trading it conducted for the Clubs was profitable. The agreements typically entitled Trade to between 20 and 40 percent of the gross trading gains it generated for the Clubs. Trade's agreements with New Life and DC Advisors, for example, entitled it to 40% of gross gains earned on principal investment amounts under $1,000,000, 30% on amounts between $1,000,000 and $5,000,000, and 20% on amounts over $5,000,000. In addition, Trade was entitled to be reimbursed for any fees licensed brokers or dealers charged and any mutually agreed upon fees paid to professionals.

24.  Between May 2007 and July 2009, Trade received at least $27.7 million from the Clubs to invest in securities and futures contracts on their behalf. The Clubs, which were formed for the purpose of pooling their members' funds to invest in stocks and other financial instruments, raised the funds from more than 800 memebers nationwide.

25.  Trade did not segregate the funds it received from each of the Clubs. Rather, it deposited all of the funds into a single operating account, which was used, for among other things, to pay purported expenses. Milton and Center had the authority to effect transactions in the operating account. Additionally, Center regularly reviewed the monthly bank statements for Trade's operating account in order to reconcile the funds Trade received and remitted to the Clubs.

## THE DEFENDANTS FALSELY REPRESENTED TO INVESTORS THEY WERE GENERATING MONTHLY TRADING PROFITS

26. In conversations at public seminars the Clubs conducted -- in Toledo, Ohio in the Fall of 2008 and in Palm Beach Gardens, Florida in the Spring of 2009 -- and in online Webinars the Clubs broadcast over the Internet for their members, the Defendants represented to the Clubs that Trade was investing their funds in securities and futures contacts and that Trade was consistently generating monthly trading profits.

27. Moreover, each month, Center prepared and sent the Clubs statements by email reflecting their purported gains and the alleged increase in the value of their investments. In addition, Trade wired funds to the Clubs in accordance with Center's representations that Trade had generated gains for the Clubs and their members.

28. Between May 2007 and July 2009, Trade conducted trading on behalf of the Clubs in accounts at three broker-dealers and three futures commission merchants. Trade funded the brokerage and futures accounts by transferring funds from Trade's operating account.

29. Milton oversaw the trading in the brokerage and futures accounts. He purchased and sold, or directed others to purchase and sell, securities in the brokerage accounts. He selected the securities, however, using a commercially available software trading program rather than a proprietary system.

30. Center discussed the trading done by Trade with Milton in weekly phone calls, and they met to discuss the results every four to six weeks. Center also reviewed Trade's brokerage statements and spoke to employees who assisted Milton with the trading.

31. Contrary to the Defendants' representation to the Clubs concerning Trade's trading performance, Trade was not consistently generating a profit every month. Rather, it was consistently losing money. In total, it incurred net losses of more than $2 million.

## THE DEFENDANTS OPERATED A PONZI SCHEME AND MISAPPROPRIATED INVESTOR FUNDS

32. Although the Defendants consistently lost money trading and overall lost more than $2 million, they paid the Clubs more than $1 million from Trade's operating account and falsely represented these proceeds were from trading gains. In classic Ponzi scheme fashion, the returns paid to the Clubs did not represent actual gains; instead, they represented payments of funds received from other investors to keep up the illusion of gains.

33. The Defendants also misappropriated millions of dollars belonging to the Clubs in Trade's operating account by using the funds to pay more than $2 million to Milton, more than $1 million to Center, and more than $1.3 million to cover purported expenses.

34. Moreover, the Defendants siphoned millions of the Clubs' funds from Trade's operating account to three other business entities they controlled. Specifically, between May 2007 and July 2009, the Defendants transferred at least $545,000 to BD, at least $100,000 to TWTT, and at least $4.2 million to CMJ Capital.

## CENTER'S INTEGRAL ROLE IN THE PONZI SCHEME

35. Center headed up the marketing and sales for Trade and acted as one its member managers. In these roles, Center helped direct Trade's day-to-day operations, made business decision for Trade, and had supervisory responsibilities over the company. In addition, Center had the authority to effect transactions in Trade's operating account, and he reviewed and reconciled the monthly bank statements for the account. Center also reviewed Trade's brokerage statements and spoke to employees who assisted Milton with the trading. Furthermore, Center discussed the trading being conducted by Trade with Milton in weekly phone calls, and they met to discuss the results every four to six weeks.

36. Based on his central role at Trade, including his review of brokerage and bank account statements, Center knew, or was extremely reckless in not knowing, that Trade was consistently losing money. Accordingly, he knew, or was extremely reckless in not knowing, the payments made to the Defendants and to other investors represented proceeds from the Ponzi scheme.

37. Center had frequent contact with investors. He executed numerous documents as member manager acknowledging Trade's acceptance of investors' funds. Also, during 2009, Center sent to a Club invoices containing specific trades the company purportedly made. However in reality, a large number of these trades were not made. Center knew, or was extremely reckless in not knowing, Trade had not made these trades.

38. Moreover, Center sent to a Club a January 9, 2009 document entitled Startup Program Special Offer that he signed as Trade's member manager. He represented in the document Trade would pay the Club 4% per month on all funds up to a total of $1 million (the monthly rate of return would go even higher if the Club placed more than $1 million with Trade). Center knew, or was extremely reckless in not knowing, Trade could not pay these outlandish returns to investors.

39. Furthermore, nearly every month, Center sent to investors spreadsheets reflecting that Trade had gains for the month. Invariably the percentage gain Center reported to investors each month was preciously equal to the targeted gain. For example, if the targeted gain was supposed to be 8%, Center would report to the Club it had made 8% for that month. Center knew, or was extremely reckless in not knowing, based on Trade's actual performance it could not pay these exorbitant returns to investors.

41. Center's representations that Trade had generated these exorbitant rates of return caused investors to substantially increase the amount of funds that they invested with the Defendants. For example, at the end of December 2008 one of the Clubs had approximately $100,000 invested with Trade. Each month, from December 2008 through June 30, 2009, Center represented Trade had made the Club substantial gains of up to 8% a month. By the end of June 30, 2009, this Club had invested more than $10 million with Trade. Center knew, or was extremely reckless in not knowing, that his representations about the gains that Trade was purportedly generating were causing investors to invest substantially more funds into their Ponzi scheme.

42. Center received more than $1 million in unlawful commissions or other forms of compensation from the fraudulent scheme from his central role in the Ponzi scheme.

43. Moreover, Center, and Trade through Center's actions, acted as an unregistered brokers. Center participated at the key points of distributions between Trade and the investors by soliciting investors, handling investors' funds or securities and through his involvement with negotiations between Trade and investors, and receiving transaction-based compensation through this Ponzi scheme and by taking investors funds without any legitimate basis.

## COUNT I

### Fraud in Violation of Section 10(b) of the Exchange Act and Rule 10b-5

**(Against all Defendants)**

44. The Commission repeats and realleges Paragraphs 1 through 43 of this Complaint as if fully set forth herein.

45. From at least May 2007 through July 2009, the Defendants, directly or indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, in connection

with the purchase or sale of securities, as described in this Complaint, knowingly, willfully or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and courses of business which have operated or would operate as a fraud upon the purchasers of such securities.

46. By reason of the foregoing, the Defendants, directly or indirectly, violated and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.

## COUNT II

### Fraud in Violation of Sections 206(1) and 206(2) of the Advisers Act

**(Against all Defendants as Primary Violators and Center as an Aider and Abettor)**

47. The Commission repeats and realleges Paragraphs 1 through 43 of this Complaint as if fully set forth herein.

48. From at least May 2007 through July 2009, by engaging in the conduct set forth above, the Defendants knowingly, willfully or extremely recklessly, through the use of the mails and the means or instrumentalities of interstate commerce, directly or indirectly, engaged in the business of advising others for compensation as to the advisability of investing in, purchasing, or selling securities, and employed devices, schemes or artifices to defraud their clients or prospective clients and engaged in transactions, practices and courses of business which have operated as a fraud or deceit upon their clients or prospective clients.

49. From at least May 2007 through July 2009, by engaging in the conduct set forth above, Center knowingly, willfully or extremely recklessly, through the use of the mails and the

means or instrumentalities of interstate commerce, directly or indirectly, aided and abetted or caused, the violations by Trade-LLC and Milton of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2) by knowingly providing substantial assistance and taking part in improper activities.

50. By reason of the foregoing, the Defendants, directly or indirectly, violated and, unless enjoined, are reasonably likely to continue to violate, Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2) and Center aided and abetted violations of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

## COUNT III

### Operating as an Unregistered Broker or Dealer in Violation of Section 15(a) of the Exchange Act

### (Solely as to Center)

51. The Commission repeats and realleges Paragraphs 1 through 43 of this Complaint as if fully set forth herein.

52. From at least May 2007 through July 2009, Center, by engaging in the conduct set forth above, directly and indirectly, by use of the means and instrumentality of interstate commerce, while acting as a broker or dealer engaged in the business of effecting transaction s in securities for the accounts of others, effected transactions in securities, or induced or attempted to induce the purchase or sale of securities, without registering as a broker or dealer in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b).

53. By reason of the foregoing, Center, directly or indirectly, has violated and, unless enjoined, will continue to violate Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court:

### Declaratory Relief

Declare, determine, and find that the Defendants committed the violations of the federal securities laws alleged in this Complaint.

### Permanent Injunctions

Issue Permanent Injunctions: (1) enjoining Trade and Milton, their officers, agents, servants, employees, attorneys, representatives and all persons in active concert or participation with them, and each of them, from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2), and Center violated Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a)(1); and (2) enjoining Center, his officers, agents, servants, employees, attorneys, representatives and all persons in active concert or participation with him, from violating Sections 10(b) and 15(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) & 78o(a)(1), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, and Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2), both directly and as an aider and abettor.

### Asset Freeze

Issue an Order freezing the assets of Trade and the Relief Defendants until further order of the Court.

### Receiver

Issue an Order appointing a Receiver over all assets held in the name of Trade and the Relief Defendants to, among other things: (1) preserve the status quo, (2) ascertain the financial condition of Trade and the Relief Defendants, (3) prevent further dissipation of the property and assets of Trade and the Relief Defendants to prevent loss, damage, and injury to investors, (4)

preserve the books, records, and documents of each of Trade and the Relief Defendants, and (5) be available to respond to investor inquiries.

## Accountings

Issue an Order directing Center to file a sworn written accounting with this Court.

## Disgorgement

Issue an Order directing the Defendants and Relief Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## Penalties

Issue an Order directing the Defendants to each pay a civil money penalty pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and Section 209 of the Advisers Act, 15 U.S.C. §80b-9.

## Further Relief

Grant such other and further relief as may be necessary and appropriate.

## Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

June 22, 2010

Respectfully submitted,

By: *[signature]*
Christopher E. Martin
Senior Trial Counsel
S.D. Fla. Bar No. A5500747
Direct Dial No.: (305) 982-6386
martinc@sec.gov

Susan E. Curtin
Senior Counsel
Massachusetts BBO No. 554550
Direct Dial No.: (305) 982-6378
curtins@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone No.:  (305) 982-6300
Facsimile No.:  (305) 536-4154