## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### Case No. 10-CV-80737-HURLEY/HOPKINS
### (Consolidated with Case No. 10-CV-80738-HURLEY/HOPKINS for the Receivership)

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,
Plaintiff,

v.

TRADE-LLC, et al.,
Defendants,

v.

BD LLC, et al.,
Relief Defendants.
_____/

COMMODITY FUTURES TRADING
COMMISSION,
Plaintiff,

v.

TRADE-LLC, et al.,
Defendants,

BD LLC, et al.,
Relief Defendants.
_____/

### UNOPPOSED SECOND INTERIM APPLICATION FOR
### ALLOWANCE OF COMPENSATION AND REIMBURSEMENT
### OF EXPENSES TO THE RECEIVER AND HIS COUNSEL

Pursuant to Section 14 of this Court's June 23, 2010 Order Appointing Receiver [DE 12],

Jeffrey C. Schneider, not individually, but solely in his capacity as the court-appointed receiver

(the "Receiver") for Trade-LLC, BD LLC, TWTT-LLC, CMJ Capital LLC, and Center

Richmond LLC (the "Receivership Entities" or "Trade"),[1] and his counsel (the law firm of

---

[1]   The Receiver was appointed for Center Richmond LLC in the Commodity Futures Trading
Commission (the "CFTC") enforcement action (Case No. 9:10-CV-80738). The CFTC action
has since been transferred to this Court and its receivership proceeding has been consolidated.

Levine Kellogg Lehman Schneider + Grossman LLP),[2] submit their Unopposed Second Interim Application for Allowance of Compensation and Reimbursement of Expenses for the time-period of <u>September 1, 2010 through November 30, 2010</u>.[3] Both the Securities and Exchange Commission (the "SEC") and the CFTC have reviewed this Fee Application and the attached billing records, and they both have no objection to the amounts sought herein.

## BACKGROUND

Since his last Report and Fee Application dated September 21, 2010, the Receiver, with the help of his professionals and staff, has settled several disputes that will add additional funds to the receivership estate. For example, the Receiver has generated **$100,000**, which represents the settlement funds on the condominium lien dispute with Milton, Center, and their lawyers. The Receiver has settled a dispute with a charitable foundation that received investor-derived funds for **$20,350**, which was a 100% return of funds. The Receiver has settled a dispute with an investor who received his entire investment back, plus profits, for **$23,200**, which represents the return of 87% of the profits that he received. The Receiver has settled a dispute with Trade's landlord in Virginia for **$2,000**. And the Receiver is currently attempting to settle disputes with several other individuals and entities that received investor-derived funds. The Receiver expects one potential settlement to bring several hundreds of thousands of dollars to the receivership estate.

The Receiver forced Milton's wife, Kathleen Milton, to agree to transfer to him ownership of their second home, which Milton purchased – in his wife's name – with investor

---

[2] The Receiver's forensic accountants (MarcumRachlin) and his specially-employed real estate counsel (Hunton & Williams LLP) will be filing a separate application for allowance and payment of compensation and reimbursement of expenses.

[3] The Order Appointing Receiver requires the Receiver to file reports and fee applications quarterly. The Receiver's First Fee Application was through August 31, 2010, which was the first quarter of the receivership. Therefore, this Second Fee Application is through November 30, 2010, which was the second quarter of the receivership.

funds.  The Miltons purchased that home for approximately **$300,000**.  The Receiver is not only marketing that home for the benefit of the defrauded victims, but also the two condominiums purchased by CMJ Capital with investor funds (the condominiums were purchased for approximately **$295,000**).  The Receiver has negotiated with multiple potential buyers for one of the units (unit 3317).  The Receiver has recently signed a purchase contract for this unit for **$160,000**.  The Receiver is waiting for the counter-signature.  The Receiver hopes to sell the other two properties soon thereafter.  The listing prices are not "fire sale" prices, which is why the real estate is taking months, rather than weeks, to sell.  In addition, the Receiver hopes to sell, and sign a purchase contract, in the coming weeks or even days for the garage space (which was previously purchased with one of the condominiums) to a current unit owner in the development (the condominium documents permit this).  Moreover, the Receiver discovered that Center used **over $200,000** of investor funds to renovate his home in Richmond, Virginia.  Because Center's home was improved with investor funds, the Receiver recorded a Notice of Lis Pendens against Center's home so it cannot be sold or further encumbered.  The Receiver also hopes to settle his claim as to Center's home improvements in the near future.

The Receiver discovered that Milton had purchased nearly **$130,000** in jewelry with investor funds.  The jewelry consisted of platinum and gold wedding bands, a platinum engagement ring, a diamond anniversary band, a diamond gold cross necklace, a three carat heart-shaped diamond, and three Breitling watches.  The Receiver also discovered that Milton was using at least two personal bank accounts after issuance of this Court's asset freeze, and that Milton had cashed funds and transferred funds to, among others, his wife when the receivership commenced.  Milton's wife assisted him with some of these transfers.  However, Milton never disclosed any of these facts to the Receiver.  Needless to say, Milton never turned over any of the jewelry or the cash to the Receiver.  The Receiver therefore moved for an Order to Show Cause as to why Milton and his wife should not be held in contempt.  This Court immediately set the

3

Receiver's motion for an evidentiary hearing.  On November 16, 2010, this Court held Milton in civil contempt.  Milton did not object and admitted his wrongdoing.  This Court gave Milton until December 1, 2010 to purge the contempt by repaying the **$172,000**, absent which he would turn himself over to this Court for incarceration.  Milton failed to purge, so this Court scheduled a hearing date on December 13, 2010.  However, the hearing date of December 13th was canceled when Milton filed a motion for continuance to postpone the hearing for two weeks, due to alleged medical treatments that Milton was undergoing on that day.  The new hearing date is January 3, 2011.

The Receiver engaged an auctioneer and appraiser to evaluate the artwork, furnishings, and furniture that was previously located at Trade's Florida office.  The auction took place on December 12, 2010, and generated approximately **$41,000**.

The Receiver continues to update investors on the receivership website by posting letters to investors at least once a month, and sometimes twice a month.  The Receiver also posts the relevant filings from the enforcement and ancillary receivership lawsuits on the website.

Because of the number of accounts used by Milton and Center, the forensic work in this case has been a massive undertaking.  Indeed, there are approximately 60 bank and brokerage accounts that need to be reconstructed in order to trace the funds that flowed into, and out of, the Receivership Entities.  The Receiver is only allowing, at this time, the accountants to reconstruct those accounts that he expects will reveal the identity of assets or transferees about which he had no knowledge.

## **WORK PERFORMED**

The Receiver's Second Report, filed concurrently with this Fee Application, chronicles in much greater detail the Receiver's work during the application period.  The Receiver will not burden this Court by repeating the contents of the Report here.  The Receiver asks that this Application be considered after the Second Report has been reviewed.  And the Receiver asks

4

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

that this Court appreciate the magnitude of the tasks with which he and his professionals have been confronted. This case was, at its inception, and still continues to be, extremely challenging because of the multiple receivership assets that the Receiver has secured, the thousands of money transfers that Milton and Center orchestrated to hide and divert funds, and the sheer volume of account records underlying the transfers. These issues have been compounded because Milton and Center, in large part, have not cooperated with the Receiver, as they were ordered to do.

This receivership is still in its infancy, as it is only five months old. However, much has been discovered and accomplished. The Receiver has secured millions of dollars in assets. The Receiver has uncovered several improper transactions from which he has filed lawsuits against profiteers of the fraud. The Receiver will file more. The Receiver has obtained a virtual mountain of records which his professionals have reviewed and will continue reviewing to trace the millions of dollars of investor funds that Milton and Center stole and laundered.

A sampling of the work during the subject application period is detailed below.

**A. The Receiver Continues to Protect Funds of over $6.4 Million**

The Receiver continues to protect in his receivership accounts the investor funds of over $6.4 million that were transferred to him from the interpleader lawsuit. This transfer ensured that the actual victims will be repaid the money that they are owed without the clubs' involvement.[4]

**B. The Receiver Continues to Take the Necessary Actions with Respect to the Properties Purchased with Receivership Funds**

The Receiver discovered that there are at least five properties that were purchased or improved with investor funds. The Receiver has filed a lis pendens on all five properties, which include:

---

[4] The clubs refer to Cash Flow Financial and New Life Club, through which Trade received the bulk of funds from investors. A third club was DC Advisors, but that club was not part of the state-court lawsuit because it had already received all of its funds back with a profit.

### 1. Midtown Units 3117 and 3317

As this Court may recall, Milton and Center, through CMJ Capital, purchased units 3117 and 3317 at the Residences at Midtown in Palm Beach Gardens for approximately $295,000. All of that money was derived from Trade (and, as a result, defrauded investors). The Receiver has continued to market both condominiums. The Receiver retained three disinterested appraisers to appraise both condominiums (this is one of the requirements under 28 U.S.C. Sections 2001 and 2002). The Receiver has signed a purchase contract for this unit for $160,000. The Receiver is waiting for the counter-signature. The Receiver will be moving for this Court to confirm the sale pursuant to the receivership protocol required by 28 U.S.C. Sections 2001 and 2002. The Receiver is hopeful to sell the other unit (unit 3117) in the near future.

The Receiver also hopes to sell, and sign a purchase contract, in the coming weeks or even days for the garage space to a current unit owner in the development. The three appraisers whom the Receiver retained have appraised the garage space. CMJ Capital had previously purchased the garage space for $20,000. The Receiver will be moving for this Court to confirm the sale pursuant to the receivership protocol required by 28 U.S.C. Sections 2001 and 2002.

As this Court may also recall, after securing both units, the Receiver discovered that there was a pre-receivership lien placed on them for $140,000. The funds were mostly used to pay Milton's and Center's attorneys' fees. Through the Receiver's efforts, Milton and Center agreed to satisfy $100,000 of the remaining amount owed under the mortgage. The Receiver filed a motion to approve this transaction, which this Court granted. Since his last Report, the Receiver has received the $100,000.

### 2. Midtown Unit 2305

The Receiver discovered that, soon before it shut down, Trade transferred $200,000 of investor funds to a Trade-insider and a close Milton-friend, Darren Jarema ("Jarema"), for him to purchase a condominium in the Residences at Midtown (the same development where Milton

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

and Center, through CMJ Capital, had purchased the two above condominiums); the condominium is unit 2305.  There is no mortgage on this property.  The Receiver sued Jarema for, among other things, a constructive trust and/or equitable lien on this property.

### 3.   19 Blenheim Court

As this Court may recall, the Receiver discovered that Milton purchased a second home – located at 19 Blenheim Court, Palm Beach Gardens, Florida – with approximately $300,000 of investor funds.  There is also no mortgage on this property.  Milton intentionally titled the home in his wife's name in an attempt to obfuscate the fact that he used investor funds to purchase it. Milton's son (Aaron Milton) was previously living in this home.

Since his last Report and Fee Application, Kathleen Milton has signed a warranty deed which transferred title in the home to the Receiver.  The warranty deed has been recorded and was drafted by the Receiver's specially-employed real estate counsel at Hunton & Williams LLP. The Receiver has secured the home, changed the locks at the home, and insured the home.  Like the condominium units, the Receiver has hired a realtor to market and sell the home.  Also like the two condominium units, the Receiver has retained three disinterested appraisers to appraise the home.

### 4.   8143 Greystone East Circle

The Receiver has discovered that Center used at least $210,000 of investor funds to renovate the entire inside of his home in Richmond, Virginia.  The Receiver therefore filed and recorded a lis pendens in Virginia on Center's home.  The Receiver hopes to settle his claim as to Center's home improvements in the near future.

In addition, Center used at least $92,000 in investor funds to re-furnish his newly-renovated home.  The Receiver has obtained a list of items that Center had purchased from the interior design company to determine what furniture and furnishings should be turned over to the Receiver.  The Receiver will obtain and sell these items for the benefit of the receivership estate.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

**5. 1827 Pierce Drive, Lake Worth, Florida 33460**

The Receiver discovered that Milton directed $75,000 of investor-derived funds to his nephew and niece, David R. and Konstantina Casazza (collectively, the "Casazzas"), with which they purchased their home located at 1827 Pierce Drive, Lake Worth, Florida 33460. There is a mortgage on this property. The Receiver sued the Casazzas for, among other things, a constructive trust and/or equitable lien on this property.

**C. The Receiver Obtains Permission to Sell Trade's Office Furniture, Fixtures, and Equipment**

The Receiver has quickly inventoried the items in storage and has filed a motion to liquidate such items for the benefit of the receivership estate, which this Court granted. The items consist of various items of office furniture, fixtures, equipment, and artwork from Trade's office in Palm Beach Gardens. The Receiver has retained an auctioneer and appraiser to evaluate the items. The auction took place on December 12, 2010, and generated approximately $41,000. The Receiver also has moved for authority to sell the personalty located in 19 Blenheim Court and condominium unit 3317.

Regarding the remaining furniture, fixtures, and equipment which was previously located in Trade's office in Richmond, Virginia (which Center ran), Center allegedly sold and salvaged nearly all the furniture, fixtures, and equipment pre-receivership. The Receiver is investigating who purchased the items, when this occurred, and how much was raised.

The Receiver has also filed a motion to approve a settlement with the Virginia landlord regarding the $9,000 security deposit. Pursuant to the settlement, the landlord will be returning $2,000 of the security deposit to the Receiver. This resolution will avoid litigation over minimal amounts of money.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

**D.  The Receiver Continues to Protect Funds Secured from Frozen Balances at Bank and Brokerage Accounts**

The SEC and the CFTC served their respective freeze Orders on a multitude of banks and brokerage firms where the Defendants and the Relief Defendants had accounts.  Like the $6.4 million, these funds have been deposited into the Receiver's protected receivership accounts.

**E.  The Receiver Continues to Take the Necessary Actions with Respect to Personal Items Purchased with Investor-Derived Funds**

Since the Receiver's last Report and Fee Application, Milton and the Centers (William and Gregory) signed a Stipulation, agreeing to list – in a formal sworn accounting – all their personal items, whether purchased with Trade-derived funds or not, and to produce documents substantiating the information.  The items purchased with Trade-derived funds will be turned over to the Receiver, after which the Receiver will sell these items for the benefit of the receivership estate.  The Stipulation corrected the provision in the receivership Orders issued in the CFTC action that required the Receiver to take possession of literally every item owned by or purchased by the Defendants.  This Court entered an Order approving the Stipulation.  Milton and the Centers have provided the Court-ordered sworn accountings to the Receiver, which the Receiver is currently analyzing.

The majority of the personalty should be located in their respective homes.  During the Receiver's inspections, his counsel photographed the items of material value within the homes. The Receiver anticipates that certain furniture and entertainment equipment from Milton's and the Centers' homes, as well as certain artwork from Milton's home, will be turned over to him, as they were likely purchased with investor-derived funds.

**F.  The Receiver Files Lawsuits against Third Parties Who Profited from the Fraud**

As of his last Report and Fee Application, the Receiver had filed five separate lawsuits against Milton, Center, and several other insiders, entities and/or individuals that received hundreds of thousands of dollars from Trade.  The lawsuits seek damages ranging from

9

approximately $100,000 to $1.8 million.  Each lawsuit is more fully described in the Receiver's First and Second Reports.  These lawsuits are:

1. *Jeffrey C. Schneider, Receiver v. Philip W. Milton, William H. Center, T & D Highway Services LLC, Dawn Peluso, Charles Reeves, Jason Zamperini, Timothy O'Connor, David R. Casazza, Konstantina Casazza, Dennis Sacco, and Roseann Sacco*, Case No. 10-61401[5];

2. *Jeffrey C. Schneider, Receiver v. Trinity United Methodist Church of Palm Beach Gardens*, Case No. 10-80941;

3. *Jeffrey C. Schneider, Receiver v. Darren Jarema and Jarema Financials Inc.*, Case No. 10-80939;

4. *Jeffrey C. Schneider, Receiver v. MC Building Consultants LLC, Impact Self-Storage LLC, Charles Reeves, and Marisa Reeves*, Case No. 10-80956; and

5. *Jeffrey C. Schneider, Receiver v. William Jordan,* Case No. 10-80955.[6]

The Receiver is hopeful that, rather than engage in costly and protracted litigation, he will be in a position to consensually resolve these lawsuits in the coming months.  The Receiver has been working toward this goal for the last few months.  For the lawsuits that he is unable to consensually resolve, the Receiver will take the necessary discovery and quickly move for summary judgment, because the issues are quite clear and do not involve any issues of material fact.  In addition, the Receiver continues to engage in pre-litigation settlement talks with several persons and entities that received significant amounts of Trade-derived funds.

### G.  The Receiver Continues His Forensic Analysis

As stated in the Receiver's First Report, Milton and Center transferred millions of investor funds to themselves, their companies, their wives, their children, their friends, their friends' companies, and other insiders in several complicated "step" transactions involving a

---

[5]  As stated above, the Receiver settled his claims against Dennis Sacco for $23,200 (his wife, Roseann, previously passed away).

[6]  The Receiver believes that William Jordan ("Jordan") has fled his residence to evade service of the complaint in the lawsuit.  Jordan received at least $87,100 of defrauded victim funds directly from Trade for no consideration or value.  Jordan also received additional investor-derived funds from others, such as Milton's wife.

literal maze of companies.  Indeed, as set forth above, Milton and Center set up an elaborate network of approximately 60 bank accounts and brokerage accounts at over 25 banks and brokerage firms in the names of themselves, their companies, their wives, their children, their friends, and their friends' companies. Literally millions of dollars of Trade-derived funds were transferred through these various accounts since Trade's inception in May 2007.

Many of the accounts were established to "park" stolen investor funds.  Milton, for example, made frequent transfers to intermediaries.  Ultimately, the money would be typically withdrawn and given back to Milton in cash.  Milton intentionally diverted money in this manner through others to conceal the money for his benefit.  Once Milton began to feel pressure from investors and the SEC, Milton intentionally accelerated the transfers of money through the intermediaries.  There is a simple answer why Milton did this – he feared and anticipated an asset freeze over his assets.[7]   Center also feared the same, which explains why he, too, began transferring his assets.

Milton's wife assisted him in diverting funds.  Pre-receivership bank statements show Mrs. Milton received investor-derived funds of thousands of dollars every few weeks from certain accounts that seem to have been specially-created to hide or divert investor-derived funds (such as Velocity Futures and Penson GHCO), from which she withdrew thousands in cash to give to Milton and/or wrote checks to Milton and other insiders.  Obviously, these diversions of funds occurred through Mrs. Milton's account(s) – with her as an intermediary – at Milton's direction and for his ultimate benefit.

The Receiver deposed Mrs. Milton.  Mrs. Milton invoked the Fifth Amendment at her deposition.  The Receiver also deposed the Miltons' son, Aaron Milton, who "worked" at Trade.

---

[7]  That is why, despite consenting to a judgment to disgorge ill-gotten gains of stolen investor funds on December 15, 2009, Milton continued to divert investor funds, and continued to transfer or sell his assets.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

Aaron Milton testified at deposition that, given the SEC's investigation and the state-court interpleader lawsuit, Milton had funds diverted to him which he then withdrew in cash to give to his father. Milton did this to sanitize the cash so it could not be directly traced to him. This all occurred at Milton's direction. Midway through the deposition, Aaron Milton was instructed to begin invoking the Fifth Amendment for all further questions (including questions about withdrawals and transfers that he had previously answered).

Likewise, Milton's friend and associate, Carmella Kydd, who allegedly owns a company called Integrity First LLC, wired funds for Milton's benefit into his and his son's accounts. These were investor-derived funds, as Milton had previously transferred tens of thousands of dollars in investor funds to Integrity First LLC (*i.e.*, Ms. Kydd). For example, Integrity First transferred funds to Aaron Milton, who then withdrew the funds in cash to give to Milton. Aaron Milton testified to this at his deposition. Moreover, after imposition of the asset freeze, Integrity First LLC wired funds to Milton. Milton then immediately transferred these funds out of his account to his wife. These are just a few examples of Milton using intermediaries (such as his wife, his son, and Ms. Kydd) to divert or hide investor-derived funds on his behalf.

## H. The Receiver Serves Dozens of Additional Subpoenas

To ensure that the Receiver has received the relevant bank and brokerage records for his forensic analysis, he has continued to serve additional subpoenas on various banks and brokerage firms with accounts in the names of, among others, Milton, Center, their companies, their wives, their children, their insiders, and their insiders' companies. Moreover, the Receiver has served additional subpoenas on persons and entities that have relevant information in the receivership.

## I. The Receiver Continues to Communicate with Investors

The Receiver has continued to ask each investor to "register" on the receivership website. The website address is www.tradereceiver.com. As of the Second Report and this Fee Application, over 700 investors have registered online. The Receiver and his professionals

continue to speak to and correspond with many investors regarding their investments. Direct communication with the individual investors is critical for the Receiver to ensure distributions are made to the rightful owners. The Receiver continues to write and post on the website monthly letters to investors. The letters provide an update on his activities. The Receiver also continues to post relevant filings from the enforcement actions and the profiteer actions on the website.

**J.   The Receiver Moves to Hold Milton in Civil Contempt**

The Receiver filed a motion to hold Milton in civil contempt as a result of his failure to turn over and advise the Receiver of $128,000 worth of jewelry that he purchased with investor-derived funds, and his movement of money – mostly in cash – at the time of and after the receivership. On November 16, 2010, this Court issued an Order finding Milton in civil contempt and giving him 15 days (*i.e.*, by December 1, 2010) within which to purge the contempt, absent which he would be taken into custody. In other words, Milton had 15 days to provide to the Receiver the jewelry and the money, or approximately $172,000, or he would be taken into custody. The issue of contempt against Milton's wife was deferred, pending Milton purging the contempt. Milton did not oppose the entry of the Order and admitted his wrongdoing. The Order also required Milton to turn over his original passport to the Receiver, which he has done.

Milton failed to purge, so this Court scheduled a hearing date on December 13, 2010. However, the hearing date of December 13th was canceled when Milton filed a motion for continuance to postpone the hearing for two weeks, due to alleged medical treatments that Milton was undergoing on that day. The new hearing date is January 3, 2011.

**K.   The Receiver Continues His Attempts to Identify Investors**

Cash Flow Financial transferred $8,144,635.26 to Trade; New Life Club transferred $14,671,913.82 to Trade; DC Advisors transferred $3,694,417.70 to Trade; and Jool Club

13

transferred $686,816.33 to Trade, for a total of approximately $26.6 million.   Moreover, approximately $1.8 million was transferred to Trade by other investors, such as so-called promissory note lenders, for a total investor amount of approximately $28.4 million.   Trade transferred $937,645.59 back to Cash Flow Financial; $1,614,463.46 back to New Life Club; $4,632,327.17 back to DC Advisors; and nothing back to Jool Club, for a total amount of approximately $7.2 million.[8]  Moreover, approximately $3.2 million was transferred to investors individually, typically as members of clubs or as promissory note lenders.  Therefore, in total, approximately $28.4 million went directly into Trade from investors and in total approximately $10.4 million went directly back from Trade to the clubs/investors, leaving a gap of approximately $18 million.  This gap consists of (1) the funds stolen by Milton and Center (approximately $10 million); (2) Trade's expenses (approximately $2 million); and (3) the escrowed funds (approximately $6.4 million).  This means that investor losses will be at least $10 million, but the Receiver expects them to be considerably higher because the clubs and their principals inevitably "skimmed money off the top."

As stated in the Receiver's last Report and Fee Application, this is an atypical receivership.  For the Receiver to ensure that the rightful persons are repaid, he needs to repay the individual members of each club and not the club itself, so he needs to know: (1) each club member's name, address, and any other contact information on file with the clubs; (2) the amount of money that each member paid to the club to put into Trade and the dates; (3) the amount of money that each member received from the club for his/her investment with Trade and the dates; and (4) all documents supporting the foregoing.

New Life Club and Cash Flow Financial have produced tens of thousands of pages of

---

[8]  The Receiver is aware of some instances in which a club member requested to cash his/her funds out individually from Trade, and not through the club.  If that occurred, the amount transferred to the club member would not be listed as money transferred back to, or by, the club.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

documents.  The Receiver has reviewed these records; however, many of their documents are lacking as to the most basic details that the Receiver needs for the claims process, such as (1) investors' addresses and other contact information; and (2) summary accounting lists of how much money each investor invested and when, and how much money each investor received and when.  The Receiver has requested from New Life Club and Cash Flow Financial that they provide a list of this information to him, and he has served follow-up subpoenas to ensure he has all back-up records for this information.  These clubs should have easy access to this information because it is the most basic of information.  If these clubs do not, the Receiver will be forced to expend an enormous amount of time to confirm all investor addresses, and reconstruct from tens of thousands of documents all amounts of money in and out for each member and the dates thereof.

Therefore, like the forensic accounting of the Defendants' and their insiders' accounts, the task of identifying and confirming the proper money amounts owed to each club member will be challenging and time-consuming. The Receiver must cross-reference every payment by wire or check from each member to each club (or in some instances, from each investor to Trade) and also cross-reference every payment by wire or check from each club to each member (or in some instances, from Trade to each investor); only this analysis will ensure that each investor is legitimate and is repaid the proper money amounts he or she is truly owed.

### L.    Future Distributions

In early 2011, the Receiver intends to file a motion to approve a claims process for this Court to approve repaying investors.  At that point, the Receiver hopes to have the necessary names, addresses, and contact information for each investor.  If he does not, that will likely delay the claims process.  The Receiver will file the necessary motions to ensure that the claims process and all distributions to investors are approved by this Court and vetted by interested persons.  The Receiver hopes to make an initial interim distribution to investors in the first half

of 2011.  Once the process has been approved, subsequent distributions will naturally be much easier and less costly.  The Receiver still believes that the amount and timing of distributions will vary based on the circumstances affecting the receivership at the time.  The Receiver's goal is to administer the receivership as quickly and efficiently as possible.

## THE RECEIVER AND HIS COUNSEL

Exhibit A reflects the Receiver's daily time records.  The Receiver's standard hourly rate is $445.00.  For purposes of this receivership, however, the Receiver reduced his hourly rate to $260.00, a reduction of approximately 40%.  For this Fee Application, the Receiver expended a total of 69.20 hours at a reduced hourly rate of $260.00 for a total of $17,992.00.

The Receiver's counsel (*i.e.*, Levine Kellogg Lehman Schneider + Grossman LLP) were retained and commenced work on the receivership on the date of the Receiver's appointment – June 23, 2010.  This Court granted the Receiver's Motion to Employ them as counsel on July 1, 2010.  The professional services rendered by the Receiver's counsel, and the necessary and reasonable non-reimbursed out-of-pocket costs relating to those services, are set forth and described in more detail on the attached Exhibit B.  Exhibit B reflects the Receiver's counsel's daily time records, which includes the description of services rendered, the hours expended, and the hourly rates.

As this Court can plainly see, fees were kept at a minimum by having associates (Patrick J. Rengstl, Adam G. Schwartz, and Brandon M. Thompson) and paralegals (Ana Salazar and Maria Carattini) perform the vast majority of the work.[9]  In addition, associate hourly rates were reduced to $200.00 and paralegal hourly rates were reduced to $125.00 for this receivership.

For this Court's convenience, the following is an aggregate tabular summary for the fees and expenses of the Receiver and his counsel:

---

[9]  Mr. Rengstl's, Mr. Schwartz's, and Mr. Thompson's standard hourly rates are $320.00, $275.00, and $240.00, respectively.  For purposes of this receivership, their hourly rates were reduced to $200.00.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

**THE RECEIVER**:

| Name of Receiver | Reduced Hourly Rate | Time Expended | Total |
|---|---|---|---|
| Jeffrey C. Schneider | $260.00 | 69.20 | $17,992.00 |

**COUNSEL**:

| Name of Attorney | Reduced Hourly Rate | Time Expended | Total Per Attorney |
|---|---|---|---|
| Patrick J. Rengstl, Esq. | $200.00 | 371.30 | $74,260.00 |
| Adam G. Schwartz, Esq. | $200.00 | 64.60 | $12,920.00 |
| Brandon M. Thompson, Esq. | $200.00 | 55.50 | $11,100.00 |
| **SUB TOTAL** | | | $98,280.00 |

**PARAPROFESSIONALS**:

| Name of Paraprofessional | Reduced Hourly Rate | Time Expended | Total Per Paraprofessional |
|---|---|---|---|
| Ana M. Salazar | $125.00 | 148.30 | $18,537.50 |
| Maria A. Carattini | $125.00 | 71.00 | $8,875.00 |
| Elsa S. Fresco | $125.00 | 1.00 | $125.00 |
| **SUB TOTAL** | | | $27,537.50 |

Exhibit B is consistent with the tabular summary provided above. Exhibit B also reflects that the Receiver's counsel incurred costs of $17,145.17, bringing the total due to the Receiver's counsel to $142,962.67.

## MEMORANDUM OF LAW

I.    **Summary of Services Rendered by the Receiver and His Counsel**

The professional services rendered by the Receiver and his counsel, and the necessary and reasonable non-reimbursed out-of-pocket costs attendant to those services, are set forth and described in more detail in Exhibits A and B. The attached records show the time spent. A mere

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

reading of the time summaries cannot completely reflect the full range of services rendered by the Receiver and his counsel, the complexity of the issues, and the pressures of time and performance which have been placed upon the Receiver and his counsel in connection with this case.

The schedules of disbursement for expenses, which are also part of Exhibits A and B, are those actual and necessary expense items, such as process service fees, photocopy charges, long distance telephone charges, telecopy charges, delivery charges, and various expenses incurred in connection with this matter. All of these expenses would typically be billed by the Receiver and his counsel to their general commercial clients.

The Receiver and his counsel have not been paid any compensation in connection with the services and expenses set forth herein.

## II.     Applicable Legal Standard Analysis

In determining attorneys' fees, a court must (1) determine the nature and extent of the services rendered; (2) determine the value of those services; and (3) consider the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F. 2d. 714 (5th Cir. 1974). *See Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 877-78 (11th Cir. 1990) (bankruptcy fee award case addressing the issue of attorney's fees generally before considering specific requirements in the bankruptcy context).   The twelve factors set forth in *Johnson*, a case involving an award of attorneys' fees under Federal civil rights statutes, as incorporated by the Eleventh Circuit in *Grant*, a bankruptcy case, are as follows:  (1) the time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or by the circumstances; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attorney; (10) the

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

### A. The Time and Labor Required

The foregoing summary description, together with the time records attached hereto, detail the time, nature, and extent of the professional services rendered by the Receiver and his counsel during the period covered by this Application.  The Receiver and his counsel have no doubt that the time spent is justified by the results that have been achieved thus far.  The Receiver and his counsel believe they have played a significant role during the course of these proceedings and will continue to do so in the future.

### B. The Novelty and Difficulty of the Questions Presented

This case required a high level of skill to secure the receivership assets and to carry out the Receiver's duties.

### C. The Skill Requisite to Perform the Services Properly

In order to perform the required services, substantial legal skill and experience in the areas of commercial law and litigation were required of the Receiver and his counsel.  The Receiver is acutely aware of the financial considerations arising in receiverships such as this one. Accordingly, as this Court may gather from Exhibits A and B, the Receiver has very leanly staffed the administration of this case as much as possible, under the direction and immediate supervision of the Receiver.

### D. The Preclusion of Other Employment Due to This Case

Although the Receiver and his counsel were not explicitly precluded as a result of this case from accepting other matters, matters in this case were treated by the Receiver and his counsel in an expeditious and professional manner.  Also, this case required the Receiver and his counsel to devote a significant amount of time during the period of this Application, to the preclusion of expending time on other active matters.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

### E.     The Customary Fee

The hourly rates of the Receiver and his counsel set forth on the attached exhibits reflect a rate that is considerably lower than the hourly rates billed by the Receiver and his counsel to clients in other cases. That is because the Receiver views this work as being in the nature of "public service," which the Receiver is proud and privileged to be able to do.   Similar – and higher – rates have been confirmed and approved in other matters in which the Receiver and his counsel have been involved.

### F.     Whether the Fee Is Fixed or Contingent

The compensation of the Receiver and his counsel in this matter is subject to the approval of this Court, and the Receiver and his counsel have not received any compensation for their services rendered to date.  The above factors should be taken into consideration by this Court, and the compensation should reflect the assumption of the risk of non-payment and delay in payment.

### G.     The Time Limitations Imposed

This case imposed time limitations on the Receiver and his counsel due to the necessity for rapid resolutions of issues.

### H.     The Experience, Reputation, and Ability of the Professionals

The Receiver and his counsel enjoy a fine reputation and have proven substantial ability in the fields of equity receiverships, litigation, bankruptcy, creditors' rights, and business reorganizations.

### I.     The "Undesirability" of the Case

This case is not undesirable, and the Receiver and his counsel are, indeed, privileged to participate in this proceeding.

### J.     The Nature and Length of Professional Relationship

The Receiver and his counsel have had no prior relationship with Milton, Center, or the

20

Receivership Entities prior to this case.

### K.   Awards in Similar Cases

The amounts requested by the Receiver and his counsel are not unreasonable in terms of awards in cases of similar magnitude and complexity. The compensation requested by the Receiver and his counsel comports with the mandate of applicable law, which directs that services be evaluated in light of comparable services performed in other cases in the community. In fact, the hourly rates requested by the Receiver and his counsel are considerably lower than the ordinary and usual hourly rates billed by the Receiver and his counsel to their ordinary clients, notwithstanding the risks associated with this case. The hourly rates are even lower than rates received by the Receiver in other receivership cases.

### L.   The Source of Payment for the Amounts Sought Hereunder

The Receiver and his counsel request that the amounts for which payment is authorized hereunder be paid from funds presently held by the Receiver.

### CERTIFICATION

Pursuant to Local Rule 7.1.A.3, undersigned counsel hereby certifies that he has conferred with counsel for the SEC, the CFTC and the Defendants, and is authorized to represent that the SEC, the CFTC and the Defendants have no objection to the relief requested herein.

The Receiver also certifies that:

a. He has read this Application;

b. To the best of his knowledge, information and belief formed after reasonable inquiry, this Application and all fees and expenses therein are true and accurate, and comply with the Billing Instructions;

c. All fees contained in this Application are based on the rates listed in the Exhibits attached hereto and such fees are reasonable, necessary and commensurate with the skill and experience required for the activity performed;

d.  He has not included in the amount for which reimbursement is sought the amortization of the cost of any investment, equipment, or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth herein for photocopies and facsimile transmission); and

e.  In seeking reimbursement for a service which he justifiably purchased or contracted for from a third party (such as copying, imaging, bulk mail, messenger service, overnight courier, computerized research, or title and lien searches), he requests reimbursement only for the amount billed to him by the third party vendor and paid by him to such vendor.  To the extent that such services were performed by him as receiver, he certifies that he is not making a profit as receiver on such reimbursable service.

## CONCLUSION

WHEREFORE, the Receiver and his counsel respectfully request that this Court enter the proposed Order, attached as Exhibit C, (a) authorizing compensation to the Receiver of $17,992.00; (b) authorizing compensation to the Receiver's counsel, Levine Kellogg Lehman Schneider + Grossman LLP, of $125,817.50 and reimbursement of expenses of $17,145.17; and (c) for any other relief that is just and proper.

Dated: December 17, 2010

Respectfully submitted,

LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
Counsel for the Receiver
201 South Biscayne Boulevard
34th Floor, Miami Center
Miami, Florida 33131
Telephone:    (305) 403-8788
Facsimile:     (305) 403-8789

By: s:/Patrick J. Rengstl
      Patrick J. Rengstl, Esq.
      FL Bar No. 0581631

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s:/Patrick J. Rengstl
Patrick J. Rengstl, Esq.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

## SERVICE LIST

**Patrick J. Rengstl, Esq.**
Attorney for Receiver
LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
201 South Biscayne Blvd.
34th Floor, Miami Center
Miami, Florida 33131
Telephone: 305.403.8788
Facsimile: 305.403.8789

**James D. Sallah, Esq.**
Former Attorney for Trade-LLC, BD LLC,
CMJ Capital LLC, and TWTT-LLC
SALLAH & COX LLC
Boca Corporate Center
2101 N.W. Corporate Blvd., Suite 218
Boca Raton, Florida 33431

**Christopher Bruno, Esq.**
Attorney for Defendant William H. Center
and Gregory Center
BRUNO & DEGENHARDT
10615 Judicial Drive, Suite 703
Fairfax, VA 22030

**John Dunfee, Esq.**
**Jason Mahoney, Esq.**
Attorney for COMMODITY FUTURES TRADING
COMMISSION
1155 21st Street, N.W.
Washington, DC 20581
Direct: (202) 418-5289

**Christopher E. Martin, Esq.**
**Susan E. Curtin, Esq.**
Attorney for Plaintiff
SECURITIES & EXCHANGE COMMISSION
Miami Regional Office
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: 305.983.6386
Facsimile: 305.536.4154
Email: martinc@sec.gov
Email: curtins@sec.gov

**Lawrence U. Taube, Esq.**
Attorney for Defendant Philip W. Milton
LAW OFFICES OF LAWRENCE U. TAUBE
500 South Australian Avenue, Suite 630
West Palm Beach, Florida 33401