## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### Case No. 10-CV-80737-HURLEY/HOPKINS
### (Consolidated with Case No. 10-CV-80738-HURLEY/HOPKINS for the Receivership)

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,
Plaintiff,

v.

TRADE-LLC, et al.,
Defendants,

v.

BD LLC, et al.,
Relief Defendants.
_____/

COMMODITY FUTURES TRADING
COMMISSION,
Plaintiff,

v.

TRADE-LLC, et al.,
Defendants,

BD LLC, et al.,
Relief Defendants.
_____/

### UNOPPOSED FOURTH INTERIM APPLICATION FOR
### ALLOWANCE OF COMPENSATION AND REIMBURSEMENT
### OF EXPENSES TO THE RECEIVER AND HIS COUNSEL

Pursuant to Section 14 of this Court's June 23, 2010 Order Appointing Receiver [DE 12],

Jeffrey C. Schneider, not individually, but solely in his capacity as the court-appointed receiver

(the "Receiver") for Trade-LLC, BD LLC, TWTT-LLC, CMJ Capital LLC, and Center

Richmond LLC (the "Receivership Entities" or "Trade"),[1] and his counsel (the law firm of

---

[1]  The Receiver was appointed for Center Richmond LLC in the Commodity Futures Trading
Commission (the "CFTC") enforcement action (Case No. 9:10-CV-80738).  The CFTC action
has since been transferred to this Court and its receivership proceeding has been consolidated.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34ᵗʰ Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

Levine Kellogg Lehman Schneider + Grossman LLP),[2] submit their <u>Unopposed</u> Fourth Interim Application for Allowance of Compensation and Reimbursement of Expenses for the time-period of March 1, 2011 through May 31, 2011.[3]  Both the Securities and Exchange Commission (the "SEC") and the CFTC have reviewed this Fee Application and the attached billing records, and they both have no objection to the amounts sought herein.

## BACKGROUND

Since his last Report and Fee Application dated April 12, 2011, the Receiver, with the help of his professionals and staff, has secured funds derived from investors, has settled several disputes with receivership targets, and has sold several receivership properties, all of which have added additional funds to the receivership estate.  For example, the Receiver settled his litigation dispute with Darren Jarema (a close Milton friend) in return for his deeding to the Receiver his condominium (purchased with investor funds for approximately **$166,000**).  The Receiver settled a dispute with one of the profiteers (T & D Highway Services LLC) and the company which assumed its assets (RoadSafe Traffic Systems) which will add approximately **$140,000** to the receivership estate.  The Receiver settled his pre-litigation dispute with New Life Club LLC's attorneys (Bose McKinney) for **$63,511.26**.  The Receiver settled his pre-litigation dispute with Annmarie Milton (Milton's daughter) for **$35,000.00**.  The Receiver settled his litigation dispute with David R. Casazza and Konstantina Casazza for **$27,000.00**.   The Receiver moved for

---

[2]  The Receiver's forensic accountants (MarcumRachlin) and his specially-employed real estate counsel (Hunton & Williams LLP) have filed, and in the future will be filing, separate fee applications.  <u>However, those professionals did not participate in the review of claims forms, which constitute the vast majority of the fees sought herein; rather, those services were performed in-house by the Receiver and his staff.</u>

[3]  The Order Appointing Receiver requires the Receiver to file reports and fee applications quarterly.  The Receiver's First Fee Application was through August 31, 2010, which was the first quarter of the receivership; the Receiver's Second Fee Application was through November 30, 2010, which was the second quarter; and the Receiver's Third Fee Application was through February 28, 2011, which was the third quarter of the receivership.  This Fee Application is, therefore, through May 31, 2011, which was the fourth quarter of the receivership.

authority to liquidate jewelry secured from Milton and another profiteer of the fraud. The jewelry was originally purchased for approximately **$17,000**. The Receiver also engaged an auctioneer to evaluate additional artwork derived from investor funds which sold for **$3,400.00**. Similarly, the Receiver recently moved for a default (and then will move for a final default judgment) against another Milton friend, William Jordan, for **$87,100.00**. Moreover, the Receiver settled in principle, and anticipates promptly moving for Court approval regarding, his claims against Charles Reeves in the T & D and MC Building lawsuits for stipulated judgments in the amounts of **$232,000.00** and **$139,000.00**, respectively. All in all, the Receiver secured settlements or sold properties during this period of over **$950,000**.

In addition, during this period, the Receiver signed a purchase contract to sell condominium unit 3117 at the Residences at Midtown, a receivership property that the Receiver secured, for **$142,500.00**. The Receiver moved for confirmation of the sale, which this Court granted. The closing will occur in the near future.

In addition, and perhaps most importantly, the Receiver has been begun the process of making distributions to investors. In other words, the Receiver has finalized a Proof of Claim Form (which was approved by this Court) and finalized the master investor list (the details of which are set forth below) and, on March 31, 2011, the Receiver mailed approximately 1,500 Proof of Claim Forms to all known investors to begin the distribution process of repaying investors.

The Receiver has received and begun to analyze approximately <u>1,000</u> proof of claim forms submitted by investors in Trade. The bar date for submission of proof of claim forms was May 16, 2011 (investors had forty-five (45) calendar days from the March 31st mail-out to complete and return the proof of claim forms to his office). The total amount that the victims claimed to be owed – according to the claim forms received – is approximately $50 million. As explained in more detail below, however, the Receiver expects that amount to be drastically

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

reduced (to approximately $22 million) because the Cash Flow Financial ("CFF") investors will be dealt with as part of a separate receivership commenced against CFF by the CFTC.[4]

 The Receiver has begun the lengthy process of reviewing and analyzing the claim forms and their voluminous attachments.  The Receiver and his staff are performing that intensive task, in house, which is why this Fee Application has some more time than prior ones.  However, these functions, once performed, need not be repeated before subsequent distributions are made. In addition, the Receiver and his staff (comprised largely of reduced-rate paralegals) have performed these functions for considerably less than outside professionals would have charged.[5]

 As further explained below, the process of compiling a master list of potential investors in Trade, mailing the claim forms to the potential investors, compiling and organizing the various bank records for confirming each investor's investment, reviewing the submitted claim forms (with attachments), and then independently confirming the claim forms with Trade's and/or the investment club's bank records has been an extremely time-consuming, methodical process.

 The Receiver expects the process of analyzing claim forms to last approximately one to two more months, because he must ensure that every investor's *net* claim amount is supported by the bank records of the investor, the specific club, and/or Trade.  The Receiver has updated investors on a monthly basis on the progress of his review.

 Because his review of the claim forms is nearing completion, the Receiver has already filed a motion with this Court in which he has recommended procedures for distributing funds to claimants, dealing with objections to claims, and setting reserve funds [DE 130].

---

[4] On March 10, 2011, the CFTC sued CFF, A.J. Watson, Michael Potts, and the Jedburgh Group (as a Relief Defendant) in the Eastern District of Michigan.  The CFTC also sought the appointment of a Receiver over CFF.  The Court in that action has appointed Phillip S. Stenger (Stenger & Stenger, P.C., 4095 Embassy Dr., S.E., Grand Rapids, Michigan 49546) as Receiver over CFF.  Laura D. Duston, also with Stenger & Stenger, P.C., is his counsel.

[5] Before making this decision, the Receiver consulted with two different outside firms that perform claims work; their fees to perform this work would have far exceeded the amount for which the Receiver and his staff performed the work.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

The Receiver continues to update investors, especially concerning the claims and distribution process, on the receivership website by posting letters to investors at least once a month, and sometimes twice a month. The Receiver also posts the relevant filings from the enforcement and ancillary receivership lawsuits on the website.

## **WORK PERFORMED**

The Receiver's Fourth Report [DE 131], filed concurrently with this Fee Application, chronicles in greater detail the Receiver's work during the application period. The Receiver will not burden this Court by repeating the contents of the Report here. The Receiver asks that this Application be considered after the Fourth Report has been reviewed. And the Receiver asks that this Court appreciate the magnitude of the tasks with which he and his professionals have been confronted. This case is extremely challenging because of the multiple receivership assets that the Receiver has secured, the thousands of money transfers that Milton and Center orchestrated to hide and divert funds, the fact that nearly all money raised was paid through an investment club (requiring yet another level of tracing), and the sheer volume of account records underlying the transfers.

As of this period, this receivership is still less than one year old. However, much has been discovered and accomplished. The Receiver has secured millions of dollars in assets. The Receiver has uncovered several improper transactions about which he has filed lawsuits. The Receiver will likely file more. The Receiver has obtained a virtual mountain of records which his professionals have reviewed and will continue reviewing to trace the millions of dollars of investor funds that Milton and Center stole and laundered. And most importantly, the Receiver has begun the process of returning money to defrauded victims. **Indeed, the Receiver's first distribution will be $5.5 million.**

A sampling of the work during the subject application period is detailed below.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

## A. Future Distributions

### 1. Analysis of Submitted Proof of Claim Forms

As stated previously, on March 31, 2011, the Receiver mailed approximately 1,500 claim forms to known investors. As of the bar date (May 16, 2011), the Receiver has received approximately 1,000 proof of claim forms.

As stated repeatedly, this is an atypical receivership. This is because the majority of investors invested in Trade by transferring their investment to the club of which he/she was a member, after which the club transferred the investor's investment to Trade. As further described below, certain clubs (such as CFF) did not transfer all of the investor funds to Trade and, instead, transferred millions of dollars of investor funds elsewhere.

Therefore, for the Receiver to ensure that the rightful persons are repaid, the Receiver must repay the individual members of each club and not the club itself, so the Receiver needed to know: (1) each club member's name, address, and any other contact information; (2) the amount of money that each member paid to the club to put into Trade and the dates; (3) the amount of money that each member received from the club for his/her investment with Trade and the dates; and (4) all documents supporting the foregoing.

The clubs (CFF, New Life Club, Jool Club, and Family and Friends Private Investment Club) did not keep adequate summaries of funds invested and received by investors, so the Receiver had no choice but to subpoena the clubs' various banks for their bank records (including, but not limited to, account statements, checks in and out, and wires in and out). The Receiver eventually received approximately 5,600 bank records from approximately five financial institutions.

The Receiver then cross-referenced payments by wire or check from each investor to each club (or in some instances, from each investor to Trade); cross-referenced each investor's money into Trade; and cross-referenced payments by wire or check from each club to each

6

investor (or in some instances, from Trade to each investor). Only this analysis will ensure that each investor is repaid the proper money amounts to which he or she is entitled.

To perform this analysis, the Receiver and his staff had to organize literally thousands of pages of these bank records for accounts in the name of CFF, New Life Club/PICS INTL, Jool Club, and Family and Friends Private Investment Club. Using a computer program to search for key words in scanned documents, the Receiver "loaded" (or scanned) the clubs' bank records electronically into a readable format to search for investor names. To accomplish this, the Receiver's professionals needed to identify the investor name on every check, wire or account statement, and type the name into the program for each corresponding check, wire or account statement. Although this process was time-intensive (due to the vast amount of bank records and investor names), this was the only way to search for and to confirm *all* of the money that an investor transferred to a club(s) <u>and</u> received from a club(s) to confirm what his or her *net* claim amount should be.

After reviewing each claim form, the Receiver then independently confirmed each claimant's individual *net* claim amount. The Receiver had to perform this task because not all investors identified on their claim forms all of the money that they received back from their investments. The Receiver accomplished this by electronically searching for each claimant's name in his electronically-created database of the clubs' bank records to locate all checks, wires or other money transfers from the club(s) to the claimant.[6] The Receiver also searched an electronic excel spreadsheet of Trade's bank records to determine if the claimant received any funds back directly from Trade (as opposed to through the club).

Based on the above, the task of reviewing claim forms and identifying and confirming the

---

[6] If the Receiver initially objects to a claim because the claimant did not provide on his or her claim form proof of his or her investment, but later the Receiver independently confirms the investment through his search of electronically-stored records, the Receiver will then remove the objection and accept proof of the investment.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

proper *net* money amounts owed to each investor has been, and will continue to be, extremely challenging and time-consuming.

### 2.   CFF Investors and the CFF Receiver

As stated in the last Report, the CFTC has filed an action against CFF and others.  In that action, Phillip Stenger was appointed Receiver for CFF.  The Receiver has had several calls with Mr. Stenger, his legal counsel, and the lawyers from the CFTC and the Securities and Exchange Commission (the "SEC").  At the CFTC's request, now that a Receiver has been appointed for CFF, the Receiver intends to make a distribution to CFF's investors by directly paying Mr. Stenger as the CFF Receiver.  There are several reasons to do this, including to avoid duplication of efforts.  The primary reason, however, is that CFF did not transfer *all* investor funds to Trade but only a small portion; specifically, <u>CFF transferred only $8 million of approximately $40-plus million received from investors to Trade</u>.  Mr. Stenger, therefore, will pursue the other funds and, therefore, should be the disbursing agent for <u>all</u> CFF funds.

The Receiver expects that the amount paid to Mr. Stenger, as the CFF Receiver, will be a fixed amount based on the net amount of money that CFF transferred to Trade.  Mr. Stenger, as the CFF Receiver, has submitted a *net* claim amount of approximately $6 million, which represents the *net* CFF funds that were transferred to Trade.  Mr. Stenger intends on, in turn, distributing that money – along with other funds that he currently has or recovers in the future – to CFF investors as part of his receivership.  This procedure ensures that Mr. Stenger and the Receiver do not duplicate efforts, which would only increase the expenses to the victims.  This procedure also ensures that CFF investors are dealt with in one proceeding rather than two, which again will help to minimize the expenses associated with these recovery and distribution efforts.

Having said that, the current pool of victims in the Trade receivership includes the CFF investors, who submitted claims totaling approximately $34 million of the $50 million claimed to

8

be owed.   For the reasons stated above, the CFF investors are, in all likelihood, going to be receiving distributions from the CFF Receiver instead of from this receivership.   As a result, the Receiver expects the total amount claimed to be owed in *this* receivership to be reduced from approximately $50 million to approximately $16 million once the CFF investors are essentially removed from the equation to be dealt with as part of the CFF receivership, which figure will then be increased by the amount of the CFF Receiver's claim in this case (approximately $6 million).   In other words, the Receiver expects the total amount claimed to be owed in *this* receivership, at the end of the day, to be approximately $22 million.   The Receiver has notified CFF investors to contact Mr. Stenger and/or his counsel, Laura D. Duston, with any questions regarding the CFF receivership or this process.

In addition, in the Receiver's experience, the total amount that victims claim to be owed on their proof of claim forms is typically higher than the actual amount that is ultimately allowed.   The reasons for that vary, but include, among other things, victims neglecting to reduce their claim by amounts that they received or victims including interest and/or fictitious profits in the amount that they claim to be owed.

Because his review of the claim forms is nearing completion, the Receiver has filed a motion with this Court in which he recommends a distribution plan and the procedures for dealing with objections to claims.

### 3.   Plan for Distributions, Objections to Claims, and Setting Reserves

Pursuant to the Order Appointing Receiver [DE 12], the Receiver is obligated to take possession of Trade's assets for the benefit of defrauded investors and to take whatever other steps are necessary for the investors' protection.   The Receiver's goal, of course, is to quickly and efficiently distribute those assets to investors with allowed claims (and to certain non-investor creditor(s)) (the "Distributions").

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

On March 31, 2011, the Receiver mailed approximately 1,500 proof of claim forms to Trade's known investors and creditors.   To date, the Receiver has received 1,014 completed proof of claim forms.   The Receiver has analyzed the majority of the proof of claim forms.

The Receiver has filed a motion requesting Court approval for a specific procedure for responding to the proof of claim forms and for making distributions of funds to Trade's investors and creditors.   To that end, the Receiver has determined that, in order to equitably accomplish distributions to investors and creditors, this Court should: (1) approve the proposed procedure for the Distributions; (2) establish the proposed procedure by which he can object to claims; and (3) establish the proposed procedure for setting reserve funds.

### a.   The Proposed Distribution Procedure

In general, the Receiver believes that the most equitable approach for the Distributions is to send each investor or creditor a pro-rata[7] amount based on the investor's or creditor's proportionate share of the total amounts invested by or owed to all investors and creditors in Trade.   The claim amount for each investor will be a _net_ claim amount, which represents all amounts invested by that investor subtracted by all amounts received by that investor regarding investments pre-receivership or post-receivership.

This Court previously approved the Receiver's proposed proof of claim form [DE 88 and 98].   The proof of claim form includes, among other things: (1) the amount of the investment in (or amount owed by) Trade (the "Initial Investment"); and (2) the amounts of any pre-receivership or post-receivership payments received by the investor or creditor regarding Trade (whether in the form of return of principal, payment of alleged profits, payment of alleged

---

[7] "Pro-rata" means that each claimant with an allowed claim receives a distribution, the amount of which is calculated as follows: the amount to be distributed to all claimants multiplied by a fraction, the numerator of which is the amount of the claimant's allowed claim and the denominator of which is the total of all allowed claims.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

interest, or payments by the investment clubs for services as ECM's,[8] compensation consultants, brokers, or the equivalent) ("Returned Amounts").   At the same time, the Receiver will determine the total dollar amount of all investments into, and other claims against, Trade (the "Investment Claim Total").

Using the proof of claim forms to compile the necessary information submitted by investors and creditors, the Receiver will determine a percentage that corresponds to each investor's (or creditor's) share of the Investment Claim Total (the "Investment Claim Percentage").[9]

Because the Receiver is netting claim amounts, each investor's or creditor's Investment Claim Percentage will be adjusted by the amounts received by such investor or creditor by way of Returned Amounts.   In other words, if the proof of claim form reveals that an investor or creditor has received Returned Amounts, that investor's or creditor's share in a Distribution will be reduced (*i.e.*, netted) by such amounts.

Based on the above, the Receiver is recommending that each claimant receive a fixed percentage of their allowed claim from the proposed distribution amount, based on the following formula: the amount of the *net* allowed claim divided by the total amount of filed claims multiplied by the proposed distribution amount.

The Receiver currently has approximately $7 million in the receivership estate.   The Receiver anticipates making a first interim distribution of $5.5 million to holders of allowed claims.   Therefore, the Receiver is recommending that each claimant with an allowed claim receive a fixed percentage of their allowed claim from the proposed $5.5 million distribution

---

[8]  "ECM's" refer to investors who received additional funds from the clubs for bringing in additional investors.

[9]  For example, if the Investment Claim Total were $50 million, and John Smith invested $5 million, then John Smith's Investment Claim Percentage would be 10% of the Investment Claim Total.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

amount, based on the following formula: the amount of the claimant's _net_ allowed claim divided by the total amount of filed claims multiplied by $5.5 million (the proposed distribution amount). The Receiver will be filing the motion to approve the first interim distribution as soon as possible.

The Receiver had contemplated recommending to this Court that claimants that received Returned Amounts not be permitted to receive distributions to the extent of their Returned Amounts until those investors who did not receive Returned Amounts are caught up to those investors who did. This form of distribution is also referred to as the "rising tide method." However, the Receiver believes that the more practical, more efficient, more equitable, more expedited, and less costly approach is to simply net out all transfers and, therefore, to treat such Returned Amounts as net principal reduction payments and permit all claimants with allowed claims to be eligible to receive distributions made by the Receiver. Otherwise, it would be a hardship on those investors who received Returned Amounts because they may not be permitted to receive any portion of the upcoming first distribution. It would also be unwieldy and costly to manage and confirm the "rising tide method," because many investors received relatively small amounts over time, often through the conduit of Trade's several investment clubs.

### b. The Proposed Distribution Procedure for CFF

As stated above, at the CFTC's request, the Receiver is recommending to make a distribution to CFF's investors by directly paying Mr. Stenger as the CFF Receiver. Again, there are several reasons to do this, including to avoid duplication of efforts, to limit expenses, and to accelerate distributions to all investors. The primary reason, however, is that CFF did not transfer _all_ of the investor funds that it received to Trade but only a small portion; specifically, CFF transferred approximately (and only) $8 million of approximately $40-plus million received from investors to Trade. Mr. Stenger, therefore, will pursue the other funds and, therefore,

should be the disbursing agent for *all* CFF funds. (Any CFF investors that directly invested in Trade will, as set forth below, be part of *this* receivership.)

As stated above, the Receiver anticipates that the total amount claimed to be owed in *this* receivership will be reduced from approximately $50 million to approximately $16 million[10] once the CFF investors are essentially removed from the equation to be dealt with as part of the CFF receivership, which figure will then be increased by the amount of the CFF Receiver's claim in this case (approximately $6 million), so the total amount claimed to be owed in *this* receivership, at the end of the day, will likely be approximately $22 million (*i.e.*, the Investment Claim Total as defined above).[11]

Through multiple postings on the Trade website, the Receiver has notified, and will continue to notify, CFF investors of this proposed procedure. Therefore, subject to the CFF Receiver's claim being allowed in this receivership in the upcoming motion for interim distribution, all CFF investor clams should be discharged in this receivership and transferred to the CFF receivership.

### c. The Proposed Procedure for Objecting to Claims

The Receiver has also sought to establish a procedure for filing and determining objections to claims in accordance with the following (the "Objections Procedure"):

    (i)    At the time of filing his motion(s) for distribution, the Receiver will simultaneously file objections and/or counterclaims to claims (or parts thereof), or a request for an extension of time to file any such objections and/or counterclaims, if additional information is needed;

    (ii)    The motion(s) for distribution, the objections, and/or counterclaims will be served on the claimants by the Receiver at the address on the claim form

---

[10]   These investors would include investors in New Life Club, Jool Club, Family and Friends Private Investment Club, and Trade directly.

[11]   If a CFF investor invested through both CFF and another club (and/or Trade directly), the investor's investment through CFF will be handled by the CFF Receiver (Mr. Stenger) and the investor's investment through the other club (and/or Trade) will be handled by the Receiver.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

submitted by the claimant, by U.S. Mail (foreign claimants will be served by DHL);

(iii)    The holders of "allowed claims"[12] will be paid by the Receiver upon an Order from this Court granting the recommended distribution. Payments will be made by check and must be cashed within ninety (90) calendar days, absent which the check will be voided, the uncashed checks will be deemed "unclaimed funds" available for distribution to other investors and creditors, and the claim will be deemed expunged and waived. The Receiver will be authorized to withhold issuing checks for future distributions to claimants who have not cashed checks from a prior distribution;

(iv)    The holders of claims to which the Receiver has objected, in whole or in part, and/or counterclaimed, will have forty-five (45) calendar days from the date of service of the objections and/or counterclaims within which to cure the deficiency and/or to respond to the Receiver in writing. Such written responses will be served by facsimile, email, or U.S. Mail on the Receiver at his office, c/o Ana Salazar, Receivership Administrator, at Levine Kellogg Lehman Schneider + Grossman LLP, 201 South Biscayne Boulevard, 34th Floor, Miami, FL 33131. If a claimant adequately and timely cures the deficiency or objection, or otherwise settles with the Receiver, the Receiver will deem the clamant a holder of an allowed claim and will immediately pay the claimant his or her distribution amount without further Order from this Court. If a claimant responds and does not adequately cure, the claimant's claim will be subject to the Objection Procedure as a "disputed claim."[13] If a claimant does not respond within the time provided, the Receiver's objections and/or counterclaims will be deemed sustained and adjudicated with prejudice, and the claim will be treated in accordance with his objections and/or counterclaims. The Receiver will file periodic status reports with this Court as to claimants who have cured (and who have been paid their distribution amount), claimants who have responded but have not adequately cured (*i.e.*, "disputed claims"), and claimants who have not responded in any manner

---

[12] "Allowed claims" will likely include: (1) the claimants who timely filed claims to which the Receiver has no objections, and thus did not file objections; (2) the claimants who timely responded to the Receiver's objection and/or counterclaim, but whose claim has been resolved in accordance with his recommended treatment in the Objection or through settlement; (3) the claimants who did not timely respond to the Receiver's objection and/or counterclaim, but whose claim shall be allowed in accordance with his recommended treatment in the Objection; and (4) the claimants who filed late claims to which the Receiver has no objections.

[13] "Disputed claims" will, therefore, include the claimants who timely responded to the Receiver's objection and/or counterclaim but who disagree with the Receiver's recommended treatment or claimants who did not cure their deficiencies.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

(and whose claim will be treated in accordance with his objections and/or counterclaims)[14];

(v)     After a response is served in writing on the Receiver, the claimant and Receiver will have ninety (90) calendar days to conduct any necessary discovery and file any dispositive motions in regards to the objections and/or counterclaims for the "disputed claim." Pursuant to the executed proof of clam forms, claimants have already submitted to the exclusive jurisdiction of this Court, and have waived the right to a jury trial, for purposes of any objections and/or counterclaims; therefore, any necessary discovery and/or dispositive motions in regards to objections and/or counterclaims will be conducted and resolved by this Court in a summary proceeding. All depositions will be conducted at the Receiver's office: Levine Kellogg Lehman Schneider + Grossman LLP, 201 South Biscayne Boulevard, 34th Floor, Miami, FL 33131;

(vi)    At the conclusion of the foregoing discovery period (or, if extended, such extended period), the Receiver will provide the Court with a status report(s) regarding the objections and/or counterclaims, and also move for a Scheduling Order detailing the process for adjudication by this Court of any objections and/or counterclaims at issue for "disputed claims"; and

(vii)   The Receiver will determine late claims on a case-by-case basis.

The Receiver reviewed the majority of the submitted proof of claim forms. More than half of them have some type of deficiency which the Receiver believes can be easily cured by the claimant, such as signing the claim form or providing proof of identity. Some investors did not include the bank records confirming their investment, but most of these deficiencies regarding the claim amount were cured by the Receiver, who assembled the bank records to track each investor's investment. In short, the Receiver is hopeful that the cure period will result in very few "disputed claims."

### d.  The Proposed Procedure for Reserves

The Receiver also has sought to establish a procedure for setting reserves for him to use to pay for the ongoing costs of administering the estate, for litigation, and for "disputed claims" (until such time as such "disputed claims" are "allowed" or "disallowed"). The Receiver does not

---

[14]  "Disallowed claims" will likely include the claimants who did not timely respond to the Receiver's objection and/or counterclaim, and whose claims should be disallowed in accordance with the Receiver's recommended treatment in the Objection.

wish for any objections (*i.e.*, because the proof of claim lacks supporting documentation, lacks a signature, lacks proof of identity, or for some other reason) to delay distributions to holders of "allowed claims." Therefore, the Receiver has proposed to be permitted to immediately pay holders of "allowed claims" their pro-rata share of each distribution, so long as the Receiver maintains in a segregated account (*i.e.*, a reserve) the percentage that would otherwise be paid to claims to which the Receiver has objected, pending a resolution on his objection to such claims in accordance with the above Objections Procedure. Again, the Receiver will be filing a motion for first interim distribution in short order, which will list the claims he is recommending to allow and the claims to which he is objecting.

The reserve shall also include funds earmarked, in his discretion, to pay for litigation and the ongoing costs of administering the receivership estate. Because the Receiver currently has approximately $7 million in the receivership estate, and because the Receiver anticipates a first distribution of $5.5 million, the Receiver anticipates setting an initial reserve of approximately $1.5 million.

**B. The Receiver Continues to Protect Funds of over $6.4 Million**

The Receiver continues to protect in his receivership accounts the investor funds of over $6.4 million that were transferred to him from the interpleader lawsuit. This transfer ensured that the actual victims will be repaid the money that they are owed without the clubs' involvement.[15]

**C. The Receiver Continues to Take the Necessary Actions with Respect to the Properties Purchased with Receivership Funds**

The Receiver discovered that there are at least five properties that were purchased or improved with investor funds.

---

[15] The clubs refer to Cash Flow Financial and New Life, through which Trade received the bulk of funds from investors. A third club was DC Advisors, but that club was not part of the state-court lawsuit because it had already received all of its funds back with a profit.

### 1.  Midtown Units 3117 and 3317

The Receiver signed a purchase contract for unit 3117 for $142,500.00; moved for this Court to confirm the sale pursuant to the receivership protocol required by 28 U.S.C. Sections 2001 and 2002, which this Court granted; and anticipates closing on the property shortly.

### 2.  Midtown Unit 2305

The Receiver discovered that, soon before it shut down, Trade transferred $200,000 of investor funds to a Trade-insider and a close Milton-friend, Darren Jarema ("Jarema"), for him to purchase a condominium in the Residences at Midtown (the same development where Milton and Center, through CMJ Capital, had purchased the two above condominiums); the condominium is unit 2305.  There is no mortgage on this property.  The Receiver sued Jarema for, among other things, a constructive trust and/or equitable lien on this property.  The Receiver's counsel took Jarema's deposition in January 2011, in which he admitted that – based on his desire to own a home and move out of his grandmother's residence, and based on his request to Milton that Milton take "care of him" so he could purchase his own home – Milton transferred to him $200,000.00 so he could purchase the condominium.  Jarema then wired $30,000.00 of the $200,000.00 back to Milton the next day, as Milton was a prolific "mover" of money.  The Receiver recently moved for summary judgment to take title to this property, after which Jarema agreed to deed the property to the Receiver in full settlement of his claims.  The Receiver will market the property and intends to sell it as soon as possible.

### 3.  8143 Greystone East Circle

The Receiver discovered that Center used at least $210,000 of investor funds to renovate the entire inside of his home in Richmond, Virginia.  The Receiver therefore filed and recorded a lis pendens in Virginia on Center's home.  The Receiver hopes to settle his claim as to Center's home improvements in the near future.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

In addition, Center used at least $92,000 in investor funds to re-furnish his newly-renovated home.  The Receiver has obtained a list of items that Center had purchased from the interior design company to determine what furniture and furnishings should be turned over to the Receiver.  The Receiver intends to obtain and sell these items for the benefit of the estate.

### 4.  1827 Pierce Drive, Lake Worth, Florida 33460

The Receiver discovered that Milton directed $75,000 of investor-derived funds to his nephew and niece, David R. and Konstantina Casazza (collectively, the "Casazzas"), with which they purchased their home located at 1827 Pierce Drive, Lake Worth, Florida 33460.  There is a mortgage on this property.  The Receiver sued the Casazzas for, among other things, a constructive trust and/or equitable lien on this property.  The Receiver recently moved for summary judgment against the Casazzas and soon thereafter settled with them for $27,000, given that there is minimal equity in the property and given their financial condition.

### D.  The Receiver Sells Personalty

The Receiver previously moved for authority to sell the personalty located in 19 Blenheim Court and condominium unit 3317, which this Court granted.  The two remaining pieces of artwork were sold by the Receiver's auctioneer for $3,400.00.

Regarding the remaining furniture, fixtures and equipment which was previously located in Trade's office in Richmond, Virginia (which Center ran), Center allegedly sold nearly all the furniture, fixtures, and equipment pre-receivership.  The Receiver is still investigating this issue.

### E.  The Receiver Continues to Protect Funds Secured from Frozen Balances at Bank and Brokerage Accounts

The SEC and the CFTC served their respective freeze Orders on a multitude of banks and brokerage firms where the Defendants and the Relief Defendants had accounts.  Like the $6.4 million, these funds have been deposited into the Receiver's protected receivership accounts.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

**F.   The Receiver Continues to Take the Necessary Actions with Respect to Personal Items Purchased with Investor-Derived Funds**

Milton and the Centers (William and Gregory) signed a Stipulation with the Receiver in which they agreed to list – in a formal sworn accounting – all of their personal items, whether purchased with Trade-derived funds or not, and to produce documents substantiating the information. The items purchased with Trade-derived funds will be turned over to the Receiver, after which the Receiver will sell these items for the benefit of the receivership estate. The Stipulation corrected the provision in the receivership Orders issued in the CFTC action that required the Receiver to take possession of literally every item owned by or purchased by the Defendants. This Court entered an Order approving the Stipulation [DE 39]. Milton and the Centers have provided the Court-ordered sworn accountings to the Receiver, which the Receiver has evaluated. The accountings are deficient in several respects and/or raise questions which require further investigation. The Receiver will attempt to resolve these issues with Milton and the Centers in the near future, absent which the Receiver will seek relief from this Court.

In addition, the Receiver moved for authority to liquidate jewelry secured from Milton and another profiteer of the fraud. The jewelry was originally purchased for approximately $17,000. The Receiver is attempting to sell the jewelry at the best possible price.

**G.  The Receiver's Lawsuits against Third Parties Who Profited from the Fraud**

The Receiver has filed five separate lawsuits against Milton, Center, and several other insiders, entities and/or individuals that received hundreds of thousands of dollars from Trade. The lawsuits seek damages ranging from approximately $100,000 to $1.8 million. Each lawsuit is more fully described in the Receiver's First, Second, and Third Reports. These lawsuits are:

> 1.  *Jeffrey C. Schneider, Receiver v. Philip W. Milton, William H. Center, T & D Highway Services LLC, Dawn Peluso, Charles Reeves, Jason Zamperini, Timothy O'Connor, David R. Casazza, Konstantina Casazza, Dennis Sacco, and Roseann*

19

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

*Sacco*, Case No. 10-61401 **(partially settled)**[16];

2. *Jeffrey C. Schneider, Receiver v. Trinity United Methodist Church of Palm Beach Gardens*, Case No. 10-80941 **(settled)**[17];

3. *Jeffrey C. Schneider, Receiver v. Darren Jarema and Jarema Financials Inc.*, Case No. 10-80939 **(settled)**[18];

4. *Jeffrey C. Schneider, Receiver v. MC Building Consultants LLC, Impact Self-Storage LLC, Charles Reeves, and Marisa Reeves*, Case No. 10-80956 **(settled in principle)**[19]; and

5. *Jeffrey C. Schneider, Receiver v. William Jordan*, Case No. 10-80955.[20]

The Receiver continues to remain hopeful that, rather than engage in costly and protracted litigation, the Receiver will be in a position to consensually resolve these lawsuits in the coming months. The Receiver has been working toward this goal for the last few months. For the lawsuits that the Receiver is unable to consensually resolve, the Receiver will take the necessary discovery and move for summary judgment, because the issues (in his view) are quite clear.

---

[16] As stated previously, the Receiver settled his claims against Dennis Sacco (his wife, Roseann, previously passed away). The Receiver recently settled his claims against T & D Highway Services LLC and the Casazzas. The Receiver has a settlement in principle with Charles Reeves. In addition, the Receiver intends to settle his claims against Philip Milton, William Center, and Jason Zamperini. The Receiver intends to pursue his claims against Timothy O'Connor, who improperly received approximately $165,000 in cash on the back end of the $1.8 million transferred from CMJ Capital to T & D Highway Services LLC.

[17] As stated above, the Receiver settled his claims against Trinity United Methodist and the lawsuit was dismissed.

[18] The Receiver recently settled his claims against Darren Jarema and Jarema Financials Inc.

[19] The Receiver anticipates moving for Court approval in the near future.

[20] William Jordan ("Jordan") has evaded service of the complaint in the lawsuit. The Receiver has filed a motion for service by publication because of Jordan's evasion, which this Court granted [DE 9 and 10]. The Receiver has also moved for a clerk's default against Jordan, which was entered [DE 18]. Jordan received at least $87,100 of defrauded victim funds directly from Trade for no consideration or value.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

All five lawsuits have been transferred to this Court. The Receiver still anticipate filing additional lawsuits in the future. In addition, the Receiver continues to engage in pre-litigation settlement talks with several persons and entities that received significant amounts of Trade-derived funds. For example, the Receiver settled his pre-litigation dispute with New Life Club LLC's attorneys for $63,511.26. The Receiver also settled his pre-litigation dispute with Annmarie Milton (Milton's daughter) for $35,000.00.

The Receiver is hopeful that, rather than engage in costly and protracted litigation, he will be in a position to consensually resolve these lawsuits in the coming months. The Receiver has been working toward this goal for the last few months. For the lawsuits that he is unable to consensually resolve, the Receiver will take the necessary discovery and quickly move for summary judgment, because the issues are quite clear and do not involve any issues of material fact. In addition, the Receiver continues to engage in pre-litigation settlement talks with several persons and entities that received significant amounts of Trade-derived funds.

### H. The Receiver Continues to Take Discovery and Serve Additional Subpoenas

The Receiver will depose in the coming months, and potentially sue, several friends and insiders who assisted Milton and Center in diverting funds. The Receiver intends to depose Milton after certain threshold testimonial issues involving the Fifth Amendment are resolved. The Receiver also intends to depose Center, his wife, and his children/children-in-law (Gregory, David, Katrina, and Carla).

The Receiver has continued to serve additional subpoenas on various banks, brokerage firms, persons, and entities that have relevant information in the receivership.

### I. The Receiver Continues to Communicate with Investors

The Receiver and his professionals continue to speak to and correspond with many investors regarding their investments. Direct communication with the individual investors is critical for the Receiver to ensure distributions are made to the rightful owners. The Receiver

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

continues to write and post on the website monthly letters to investors. The letters provide an update on his activities. The Receiver also continues to post relevant filings from the enforcement actions and the profiteer actions on the website.

## THE RECEIVER AND HIS COUNSEL

Exhibit A reflects the Receiver's daily time records. The Receiver's standard hourly rate is $465.00. For purposes of this receivership, however, the Receiver reduced his hourly rate to $260.00, a reduction of approximately 40%, and capped it at that rate throughout the duration of this case. For this Fee Application, the Receiver expended a total of 36.80 billable hours at a reduced hourly rate of $260.00 for a total of $9,568.00.

The Receiver's counsel (i.e., Levine Kellogg Lehman Schneider + Grossman LLP), also with capped, reduced rates, were retained and commenced work on the receivership on the date of the Receiver's appointment – June 23, 2010. This Court granted the Receiver's Motion to Employ them as counsel on July 1, 2010. The professional services rendered by the Receiver's counsel, and the necessary and reasonable non-reimbursed out-of-pocket costs relating to those services, are set forth and described in more detail on the attached Exhibit B. Exhibit B reflects the Receiver's counsel's daily time records, which includes the description of services rendered, the hours expended, and the hourly rates.

The Receiver deflected the vast majority of the legal work in this case to Mr. Rengstl.[21] As this Court can plainly see, fees were kept at a minimum by having Mr. Rengstl, associates (Brandon M. Thompson) and paralegals (Ana Salazar, Maria Carattini, Sara Stein, Elsa Fresco, and Stephanie Moncada) perform the vast majority of the legal work, much of which, again, involved the claims process and the review of the voluminous amount of submitted claim

---

[21] Despite the fact that Mr. Rengstl is now a partner of the firm, his hourly rate has remained the same as before ($200.00 for associates as opposed to $250.00 for partners) to maximize the recovery of all victims.

forms.[22]  In addition, associate hourly rates were reduced to $200.00 and paralegal hourly rates were reduced to $125.00 for this receivership.

For this Court's convenience, the following is an aggregate tabular summary for the fees and expenses of the Receiver's counsel:

**COUNSEL**:

| Name of Attorney | Reduced Hourly Rate | Time Expended | Total Per Attorney |
|---|---|---|---|
| Patrick J. Rengstl, Esq. | $200.00 | 247.40 | $49,480.00 |
| Brandon M. Thompson, Esq. | $200.00 | 81.00 | $16,200.00 |
| **SUB TOTAL** | | | **$65,680.00** |

**PARAPROFESSIONALS**:

| Name of Paraprofessional | Reduced Hourly Rate | Time Expended | Total Per Paraprofessional |
|---|---|---|---|
| Ana M. Salazar | $125.00 | 306.80 | $38,350.00 |
| Maria A. Carattini | $125.00 | 94.80 | $11,850.00 |
| Sara Stein | $125.00 | 263.80 | $32,975.00 |
| Elsa Fresco | $125.00 | 38.70 | $4,837.50 |
| Stephanie Moncada | $125.00 | 143.20 | $17,900.00 |
| **SUB TOTAL** | | | **$105,912.50** |

**COSTS**:

| | | | |
|---|---|---|---|
| **SUB TOTAL** | | | **$10,672.89** |

---

[22]  Mr. Rengstl's and Mr. Thompson's standard hourly rates for 2011 are $340.00 and $260.00, respectively.  For purposes of this receivership, their hourly rates were reduced to $200.00.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

**TOTAL DUE IN FEES AND COSTS FOR COUNSEL:**

| TOTAL | | | $182,265.39 |
|---|---|---|---|

Exhibit B is consistent with the tabular summary provided above.

### MEMORANDUM OF LAW[23]

**I.     Summary of Services Rendered by the Receiver and His Counsel**

The professional services rendered by the Receiver and his counsel, and the necessary and reasonable non-reimbursed out-of-pocket costs attendant to those services, are set forth and described in more detail in Exhibits A and B. The attached records show the time spent. A mere reading of the time summaries cannot completely reflect the full range of services rendered by the Receiver and his counsel, the complexity of the issues, and the pressures of time and performance which have been placed upon the Receiver and his counsel in connection with this case.

The schedules of disbursement for expenses, which are also part of Exhibits A and B, are those actual and necessary expense items, such as process service fees, photocopy charges, long distance telephone charges, telecopy charges, delivery charges, and various expenses incurred in connection with this matter. All of these expenses would typically be billed by the Receiver and his counsel to their general commercial clients.

The Receiver and his counsel have not been paid any compensation in connection with the services and expenses set forth herein.

**II.     Applicable Legal Standard Analysis**

In determining attorneys' fees, a court must (1) determine the nature and extent of the

---

[23] Because this filing exceeds twenty (20) pages, and pursuant to Local Rule 7.1(c), the Receiver requests permission herein to file this Fee Application in excess of twenty (20) pages. The Receiver has included an extensive summary of the work performed during this period which is the reason why this Fee Application exceeds twenty (20) pages.

24

services rendered; (2) determine the value of those services; and (3) consider the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F. 2d. 714 (5th Cir. 1974). *See Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 877-78 (11th Cir. 1990) (bankruptcy fee award case addressing the issue of attorney's fees generally before considering specific requirements in the bankruptcy context). The twelve factors set forth in *Johnson*, a case involving an award of attorneys' fees under Federal civil rights statutes, as incorporated by the Eleventh Circuit in *Grant*, a bankruptcy case, are as follows: (1) the time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or by the circumstances; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

A.    **The Time and Labor Required**

The foregoing summary description, together with the time records attached hereto, detail the time, nature, and extent of the professional services rendered by the Receiver and his counsel during the period covered by this Application. The Receiver and his counsel have no doubt that the time spent is justified by the results that have been achieved thus far. The Receiver and his counsel believe they have played a significant role during the course of these proceedings and will continue to do so in the future.

B.    **The Novelty and Difficulty of the Questions Presented**

This case required a high level of skill to secure the receivership assets and to carry out the Receiver's duties.

### C.    The Skill Requisite to Perform the Services Properly

In order to perform the required services, substantial legal skill and experience in the areas of commercial law and litigation were required of the Receiver and his counsel. The Receiver is acutely aware of the financial considerations arising in receiverships such as this one. Accordingly, as this Court may gather from Exhibits A and B, the Receiver has very leanly staffed the administration of this case as much as possible, under the direction and immediate supervision of the Receiver.

### D.    The Preclusion of Other Employment Due to This Case

Although the Receiver and his counsel were not explicitly precluded as a result of this case from accepting other matters, matters in this case were treated by the Receiver and his counsel in an expeditious and professional manner. Also, this case required the Receiver and his counsel to devote a significant amount of time during the period of this Application, to the preclusion of expending time on other active matters.

### E.    The Customary Fee

The hourly rates of the Receiver and his counsel set forth on the attached exhibits reflect a rate that is considerably lower than the hourly rates billed by the Receiver and his counsel to clients in other cases. That is because the Receiver views this work as being in the nature of "public service," which the Receiver is proud and privileged to be able to do.   Similar – and higher – rates have been confirmed and approved in other matters in which the Receiver and his counsel have been involved.

### F.    Whether the Fee Is Fixed or Contingent

The compensation of the Receiver and his counsel in this matter is subject to the approval of this Court, and the Receiver and his counsel have not received any compensation for their services rendered to date. The above factors should be taken into consideration by this Court, and the compensation should reflect the assumption of the risk of non-payment and delay in

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

payment.

### G.     The Time Limitations Imposed

This case imposed time limitations on the Receiver and his counsel due to the necessity for rapid resolutions of issues.

### H.     The Experience, Reputation, and Ability of the Professionals

The Receiver and his counsel enjoy a fine reputation and have proven substantial ability in the fields of equity receiverships, litigation, bankruptcy, creditors' rights, and business reorganizations.

### I.     The "Undesirability" of the Case

This case is not undesirable, and the Receiver and his counsel are, indeed, privileged to participate in this proceeding.

### J.     The Nature and Length of Professional Relationship

The Receiver and his counsel have had no prior relationship with Milton, Center, or the Receivership Entities prior to this case.

### K.     Awards in Similar Cases

The amounts requested by the Receiver and his counsel are not unreasonable in terms of awards in cases of similar magnitude and complexity.  The compensation requested by the Receiver and his counsel comports with the mandate of applicable law, which directs that services be evaluated in light of comparable services performed in other cases in the community. In fact, the hourly rates requested by the Receiver and his counsel are considerably lower than the ordinary and usual hourly rates billed by the Receiver and his counsel to their ordinary clients, notwithstanding the risks associated with this case.  The hourly rates are even lower than rates received by the Receiver in other receivership cases.

### L.     The Source of Payment for the Amounts Sought Hereunder

The Receiver and his counsel request that the amounts for which payment is authorized

hereunder be paid from funds presently held by the Receiver.

## CERTIFICATION

Pursuant to Local Rule 7.1.A.3, undersigned counsel hereby certifies that he has conferred with counsel for the SEC, the CFTC and the Defendants, and is authorized to represent that the SEC, the CFTC and the Defendants have no objection to the relief requested herein.

The Receiver also certifies that:

a.  He has read this Application;

b.  To the best of his knowledge, information and belief formed after reasonable inquiry, this Application and all fees and expenses therein are true and accurate, and comply with the Billing Instructions;

c.  All fees contained in this Application are based on the rates listed in the Exhibits attached hereto and such fees are reasonable, necessary and commensurate with the skill and experience required for the activity performed;

d.  He has not included in the amount for which reimbursement is sought the amortization of the cost of any investment, equipment, or capital outlay (except to the extent that any such amortization is included within the permitted allowable amounts set forth herein for photocopies and facsimile transmission); and

e.  In seeking reimbursement for a service which he justifiably purchased or contracted for from a third party (such as copying, imaging, bulk mail, messenger service, overnight courier, computerized research, or title and lien searches), he requests reimbursement only for the amount billed to him by the third party vendor and paid by him to such vendor.  To the extent that such services were performed by him as receiver, he certifies that he is not making a profit as receiver on such reimbursable service.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

## CONCLUSION

WHEREFORE, the Receiver and his counsel respectfully request that this Court enter the proposed Order, attached as Exhibit C, (a) authorizing compensation to the Receiver of $9,568.00; (b) authorizing compensation to the Receiver's counsel, Levine Kellogg Lehman Schneider + Grossman LLP, of $171,592.50 and reimbursement of costs of $10,672.89; and (c) for any other relief that is just and proper.

Dated: August 18, 2011                    Respectfully submitted,

                                          LEVINE KELLOGG LEHMAN
                                          SCHNEIDER + GROSSMAN LLP
                                          Counsel for the Receiver
                                          201 South Biscayne Boulevard
                                          34th Floor, Miami Center
                                          Miami, Florida 33131
                                          Telephone:    (305) 403-8788
                                          Facsimile:    (305) 403-8789

                                          By:s:/Patrick J. Rengstl
                                               Patrick J. Rengstl, Esq.
                                               FL Bar No. 0581631

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s:/Patrick J. Rengstl
Patrick J. Rengstl, Esq.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

## SERVICE LIST

**Patrick J. Rengstl, Esq.**
Attorney for Receiver
LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
201 South Biscayne Blvd.
34th Floor, Miami Center
Miami, Florida 33131
Telephone: 305.403.8788
Facsimile: 305.403.8789

**James D. Sallah, Esq.**
Former Attorney for Trade-LLC, BD LLC,
CMJ Capital LLC, and TWTT-LLC
SALLAH & COX LLC
Boca Corporate Center
2101 N.W. Corporate Blvd., Suite 218
Boca Raton, Florida 33431

**Christopher Bruno, Esq.**
Attorney for Defendant William H. Center
and Gregory Center
BRUNO & DEGENHARDT
10615 Judicial Drive, Suite 703
Fairfax, VA 22030

**John Dunfee, Esq.**
**Jason Mahoney, Esq.**
Attorney for COMMODITY FUTURES TRADING
COMMISSION
1155 21st Street, N.W.
Washington, DC 20581
Direct: (202) 418-5289

**Christopher E. Martin, Esq.**
**Susan E. Curtin, Esq.**
Attorney for Plaintiff
SECURITIES & EXCHANGE COMMISSION
Miami Regional Office
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: 305.983.6386
Facsimile: 305.536.4154
Email: martinc@sec.gov
Email: curtins@sec.gov

**Lawrence U. Taube, Esq.**
Attorney for Defendant Philip W. Milton
LAW OFFICES OF LAWRENCE U. TAUBE
500 South Australian Avenue, Suite 630
West Palm Beach, Florida 33401