## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### Case No. 10-CV-80737-HURLEY/HOPKINS
### (Consolidated with Case No. 10-CV-80738-HURLEY/HOPKINS for the Receivership)

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,
Plaintiff,

v.

TRADE-LLC, et al.,
Defendants,

v.

BD LLC, et al.,
Relief Defendants.
_____/

COMMODITY FUTURES TRADING
COMMISSION,
Plaintiff,

     v.

TRADE-LLC, et al.,
Defendants,

BD LLC, et al.,
Relief Defendants.
_____/

### NOTICE OF FILING

Jeffrey C. Schneider, not individually, but solely in his capacity as the court-appointed

receiver (the "Receiver") for Trade-LLC, BD LLC, TWTT-LLC, CMJ Capital LLC, and Center

Richmond LLC, hereby files the attached Fifth Report of Receiver dated November 4, 2011.

Dated: November 4, 2011

Respectfully submitted,

LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
Counsel for the Receiver
201 South Biscayne Boulevard
34th Floor, Miami Center
Miami, Florida 33131
Telephone: (305) 403-8788
Facsimile: (305) 403-8789

By: s:/Patrick J. Rengstl
      Patrick J. Rengstl, Esq.
      FL Bar No. 0581631

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s:/Patrick J. Rengstl
Patrick J. Rengstl, Esq.

## SERVICE LIST

**Patrick J. Rengstl, Esq.**
Attorney for Receiver
LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
201 South Biscayne Blvd.
34th Floor, Miami Center
Miami, Florida 33131
Telephone: 305.403.8788
Facsimile: 305.403.8789

**Christopher E. Martin, Esq.**
**Susan E. Curtin, Esq.**
Attorney for Plaintiff
SECURITIES & EXCHANGE COMMISSION
Miami Regional Office
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: 305.983.6386
Facsimile: 305.536.4154
Email: martinc@sec.gov
Email: curtins@sec.gov

**James D. Sallah, Esq.**
Former Attorney for Trade-LLC, BD LLC,
CMJ Capital LLC, and TWTT-LLC
SALLAH & COX LLC
Boca Corporate Center
2101 N.W. Corporate Blvd., Suite 218
Boca Raton, Florida 33431

**Lawrence U. Taube, Esq.**
Attorney for Defendant Philip W. Milton
LAW OFFICES OF LAWRENCE U TAUBE
500 South Australian Avenue, Suite 630
West Palm Beach, Florida 33401

**Christopher Bruno, Esq.**
Attorney for Defendant William H. Center
and Gregory Center
BRUNO & DEGENHARDT
10615 Judicial Drive, Suite 703
Fairfax, VA 22030

**Jason Mahoney, Esq.**
Attorney for COMMODITY FUTURES TRADING
COMMISSION
1155 21st Street, N.W.
Washington, DC 20581
Direct: (202) 418-5289

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 10-CV-80737-HURLEY/HOPKINS
(Consolidated with Case No. 10-CV-80738-HURLEY/HOPKINS for the Receivership)

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,
Plaintiff,

v.

TRADE-LLC, et al.,
Defendants,

v.

BD LLC, et al.,
Relief Defendants.
_____/

COMMODITY FUTURES TRADING
COMMISSION,
Plaintiff,

v.

TRADE-LLC, et al.,
Defendants,

BD LLC, et al.,
Relief Defendants.
_____/

## FIFTH REPORT OF RECEIVER JEFFREY C. SCHNEIDER

Jeffrey C. Schneider, not individually, but solely in his capacity as receiver (the "Receiver") for Trade-LLC, BD LLC, TWTT-LLC, CMJ Capital LLC, and Center Richmond LLC (collectively, the "Receivership Entities" or "Trade"),[1] submits this Fifth Report.

---

[1] The Commodity Futures Trading Commission (the "CFTC") enforcement action (Case No. 9:10-CV-80738) has been transferred to this Court and its receivership proceeding has been consolidated.

## I.   General Overview

I am pleased to advise this Court that, since my last Report dated August 18, 2011, I filed a motion for a first interim distribution, in which I recommended making a **$5.5 million** distribution to claimants with "allowed claims" in the receivership.[2]  I have memorialized my recommended treatment of claims in a voluminous claim matrix, which summarized several months of work analyzing 1,020 claim forms submitted to me.  A copy of the Claim Matrix is attached as Exhibit A.  I have already sent the Claim Matrix to all investors and creditors, along with a detailed letter explaining the process.  I also finished my review of the **1,020** proof of claim forms submitted by investors and creditors in Trade.  In accordance with this Court's Order approving the distribution motion, I am preparing to issue distribution checks to claimants with "allowed claims" and claimants who timely and properly cured any claim deficiencies.

In fact, my proposed cure period has been working for the benefit of Trade's investors and creditors.  Based on my recommendation, this Court authorized the cure period as a self-executing procedure, which allows me to issue distribution checks promptly after a claimant cures or after the claim issue is otherwise resolved by me without further Court Order.

Since sending the Claim Matrix to investors and creditors, dozens of them have contacted me and my professionals – by email, facsimile, mail, and telephone – to cure their claim deficiencies.  For example, many claimants forgot to provide a copy of their driver's license or Passport when they submitted their claim form.  Many have now provided such a copy, and because they have cured their claim deficiency, I have accepted their claim and will be issuing them a distribution check.  Similarly, I objected to claims in which my recommended claim amount differed from the claimant's.  In response, many of these claimants have now confirmed

---

[2]  This Court approved the requested distribution [DE 144].

2

in writing that they agree with my recommended claim amount, and I will be issuing them a distribution check. The cure period ends on December 5, 2011, and I expect dozens of additional investors and creditors to continue curing any claim deficiencies.

As explained in my Fourth Report and below, the process of compiling a master list of potential investors in Trade, mailing the claim forms to the potential investors, compiling and organizing the various bank records for confirming each investor's investment, reviewing the submitted claim forms (with attachments), and then independently confirming the claim forms with Trade's and/or the investment club's bank records was an extremely time-consuming, methodical process. The primary reason for this was that I had to ensure that every investor's *net* claim amount was supported by the bank records of the investor, the specific club, and/or Trade. The total amount that the victims claimed to be owed – according to the claim forms received – was $22,333,684.84, which, as explained in more detail below, was drastically reduced because the Cash Flow Financial ("CFF") investors will be dealt with as part of the CFF receivership.[3]

In addition to dealing with the claims and distribution process, which has been occupying the vast majority of our time, I have also, since my last Report, settled several remaining disputes and moved to sell personalty derived from investor funds, all of which have added additional funds to the receivership estate. For example, I signed a purchase contract to sell for **$160,000.00** the condominium unit at the Residences at Midtown, a receivership asset that I secured as part of my settlement with Darren Jarema (a close friend of Philip Milton and a

---

[3] On March 10, 2011, the CFTC sued CFF, A.J. Watson, Michael Potts, and the Jedburgh Group (as a Relief Defendant) in the Eastern District of Michigan. The CFTC also sought the appointment of a Receiver over CFF. The Court in that action has appointed Phillip S. Stenger (Stenger & Stenger, P.C., 4095 Embassy Dr., S.E., Grand Rapids, Michigan 49546) as Receiver over CFF. Laura D. Duston, also with Stenger & Stenger, P.C., is his counsel.

former Trade employee).[4]  I settled my litigation disputes with: (1) Philip Milton and William

Center for stipulated judgments in the amount of $1.8 million in the T & D lawsuit[5]; (2) Charles

Reeves in the T & D and MC Building lawsuits for stipulated judgments in the amounts of

**$232,000.00** and **$139,000.00**, respectively[6]; (3) Timothy O'Connor in the T & D lawsuit for a

stipulated judgment in the amount of **$75,000.00**[7]; and (4) Jason Zamperini in the T & D lawsuit

for **$6,000.00**.[8]  Similarly, I obtained a final default judgment against another Milton friend,

William Jordan, for **$87,100.00**.[9]  Moreover, I sold jewelry secured from Milton and another

profiteer of the fraud for **$6,500.00**.[10]  I have also engaged an auctioneer to evaluate additional

artwork derived from investor funds.[11]  And I have filed a new lawsuit against a recipient of

**$500,000.00** of investor-derived funds.  I hope to resolve that lawsuit as soon as possible.

I continue to update investors on the receivership website (www.tradereceiver.com) by

posting letters to investors approximately once a month, and sometimes twice a month.  I also

continue to post relevant filings from the enforcement and ancillary receivership lawsuits on the

website.

The purpose of this Report is to more specifically advise this Court and other interested

---

[4]  This Court confirmed the sale of this property [DE 145 and 146].  The closing is expected to
occur by the end of November.

[5]  This Court approved this settlement [DE 92].

[6]  This Court approved this settlement [DE 91 and 38, respectively].

[7]  This Court approved this settlement [DE 96].

[8]  This Court approved this settlement [DE 90].

[9]  This Court issued the Final Default Judgment [DE 21].

[10]  This Court previously granted me the authority to sell this jewelry [DE 121].

[11]  I will be moving for authority to sell this artwork.

parties as to the material actions that I have taken since my last Report dated August 18, 2011, which, among other things, include:

- Distributions
- Marshaling of the Receivership Entities' assets
- Filing lawsuits against third parties who received the fruits of the fraud
- Discovery

**II.     Distributions**

As stated above, I recently moved for authorization to make a first interim distribution of $5.5 million.

**A. Summary of the Claims Procedure**

On March 31, 2011, I mailed approximately 1,500 proof of claim forms to known claimants in Trade. I previously developed the claim form, which this Court had approved [DE 88 and 98]. The deadline, or "bar date," for submitting the claim forms was May 16, 2011. I received and have reviewed the 1,020 proof of claim forms submitted to me.

As stated repeatedly, this is an atypical receivership, because the majority of investors invested in Trade by transferring their investment to the club of which he or she was a member, after which the club transferred (or was allegedly supposed to transfer) the investor's investment to Trade. However, certain clubs (such as CFF and Jool Club) did not transfer all of the investor funds to Trade and, instead, transferred millions of dollars of investor funds elsewhere. Therefore, for me to ensure that the rightful persons are repaid, I have repaid, and will be repaying, the individual members of each club and not the club itself.

To perform the claims analysis, I had to organize literally thousands of pages of bank records from accounts in the name of CFF, New Life Club/PICS INTL, Jool Club, and Family

and Friends Private Investment Club.  Using a computer program to search for key words in scanned documents, I "loaded" (or scanned) the clubs' bank records electronically into a readable format to search for investor names.  To accomplish this, I needed to identify the investor name on every check, wire or account statement, and type the name into the program for each corresponding check, wire or account statement.  Although this process was time-intensive (due to the vast amount of bank records and investor names), this was the only way to confirm how much an investor transferred to a club(s) and received from a club(s) to confirm what his or her *net* claim amount should be.

After reviewing each claim form, I then independently confirmed each claimant's individual *net* claim amount.  I had to perform this task because not all investors identified on their claim forms all of the money that they received back from their investments.  I accomplished this by electronically searching for each claimant's name in my electronically-created database of the clubs' bank records to locate all checks, wires or other money transfers from the club(s) to the claimant.  I also searched an electronic excel spreadsheet of Trade's bank records to determine if the claimant received any funds back directly from Trade (as opposed to through the club).

### B.  Court-Approved Plan for Distributions and Objections to Claims

Because I required specific procedures for making distributions and responding to proofs of claim (including objecting to claims), I filed a motion for such procedures [DE 130], which this Court granted [DE 133].  Below is a summary of the Court-approved procedures.

#### 1.  Court-Approved Distribution Procedure

I have made, and will continue to make, distributions on a pro-rata[12] basis based on the

---

[12] "Pro-rata" means that each claimant with an allowed claim receives a distribution, the amount

investor's or creditor's proportionate share of the total amounts invested by or owed to all investors and creditors in Trade. The claim amount for each investor will be a *net* claim amount, which represents all amounts invested by that investor less all amounts received by that investor.

The proof of claim form includes, among other things: (1) the amount of the investment in (or amount owed by) Trade (the "Initial Investment"); and (2) the amounts of any pre-receivership or post-receivership payments received by the investor or creditor regarding Trade (whether in the form of return of principal, payment of alleged profits, payment of alleged interest, or payments by the investment clubs for services as ECM's,[13] compensation consultants, brokers, or the equivalent) ("Returned Amounts"). At the same time, I have determined the total dollar amount of <u>all</u> investments into, and other claims against, Trade (the "Investment Claim Total"). Using the proof of claim forms to compile the necessary information submitted by investors and creditors, I have determined a percentage that corresponds to each investor's (or creditor's) share of the Investment Claim Total (the "Investment Claim Percentage").[14]

Because I am netting claim amounts, each investor's or creditor's Investment Claim Percentage will be adjusted by the amounts received by such investor or creditor by way of Returned Amounts. In other words, if the proof of claim form reveals that an investor or creditor has received Returned Amounts, that investor's or creditor's share in a distribution will be reduced (*i.e.*, netted) by such amounts.

---

of which is calculated as follows: the amount to be distributed to all claimants (*i.e.*, $5.5 million) multiplied by a fraction, the numerator of which is the amount of the claimant's allowed claim and the denominator of which is the <u>total</u> of <u>all</u> allowed claims.

[13]  "ECM's" is the vernacular used by the clubs to refer to investors who received additional funds from the clubs for bringing in additional investors.

[14]  For example, if the Investment Claim Total was $50 million, and John Smith invested $5 million, then John Smith's Investment Claim Percentage would be 10% of the Investment Claim Total.

Each allowed claimant will receive a fixed percentage of their allowed claim from the proposed distribution amount based on the following formula: the amount of the *net* allowed claim divided by the total amount of filed claims multiplied by the proposed distribution amount.

I currently have approximately $7 million in the receivership estate. As stated above, my first interim distribution (with the consent of the SEC and the CFTC) was in the amount of $5.5 million to holders of "allowed claims." Therefore, each claimant with an "allowed claim" has received, or will be receiving, a fixed percentage of his or her allowed claim from the proposed $5.5 million distribution amount based on the following formula: the amount of the claimant's *net* allowed claim divided by the total amount of filed claims multiplied by $5.5 million (the distribution amount).

## 2.  Court-Approved Distribution Procedure for CFF

This Court has authorized me to make a distribution to CFF's investors by directly paying Phillip S. Stenger as the CFF Receiver. There are several reasons why this is being done. As stated previously, the primary reason is that CFF did not transfer *all* investor funds to Trade but only a small portion; specifically, <u>CFF transferred only $8 million of approximately $40-plus million received from investors to Trade</u>. Mr. Stenger, therefore, will pursue the other funds and, therefore, should be the disbursing agent for <u>all</u> CFF funds. (Any CFF investors that directly invested in Trade will be part of *this* receivership.)

The amount paid to Mr. Stenger, as the CFF Receiver, is a fixed amount based on the net amount of money that CFF transferred to Trade. Mr. Stenger, as the CFF Receiver, has submitted a *net* claim amount of $6,010,359.67, which represents the *net* CFF funds that were transferred to Trade. I have allowed that claim and have paid Mr. Stenger a distribution check based on that net claim amount. Mr. Stenger intends on, in turn, distributing that money – along

with other funds that he currently has or recovers in the future – to CFF investors as part of his receivership.  This procedure ensures that Mr. Stenger and I do not duplicate efforts, which would only increase the expenses to the victims.  This procedure also ensures that CFF investors are dealt with in one proceeding rather than two, which again will help to minimize the expenses associated with these recovery and distribution efforts.

The total amount claimed to be owed in this receivership (*i.e.*, the Investment Claim Total as defined above)[15] is $22,333,684.84; this amount includes all non-CFF investments (*i.e.*, investments into Trade directly, New Life Club, Jool Club, Friends and Family Private Investment Club, and DC Advisors) and the CFF Receiver's claim amount.[16]  Because the CFF Receiver's claim has been allowed in this receivership, all CFF investor clams will be discharged in this receivership and transferred to the CFF receivership.

I have notified CFF investors to contact Mr. Stenger and/or his counsel, Laura D. Duston, with any questions regarding the CFF receivership or this process.  They can be reached at Stenger & Stenger, P.C., 4095 Embassy Dr., S.E., Grand Rapids, Michigan 49546; Telephone: 616.940.1190; Facsimile: 616.940.1192.  I anticipate further collaboration and cooperation with Mr. Stenger and his team as this receivership and the CFF receivership unfold.

### 3.  Court-Approved Procedure for Objecting to Claims

The Court-approved procedure for filing and determining objections to claims (the "Objections Procedure") is as follows:

---

[15]  If a CFF investor invested through both CFF and another club (and/or Trade directly), the investor's investment through CFF will be handled by the CFF Receiver (Mr. Stenger) and the investor's investment through the other club (and/or Trade) will be handled by me.

[16]  Again, the CFF investors have been essentially removed from the equation to be dealt with as part of the CFF receivership, which has significantly reduced the total amount claimed to be owed in *this* receivership.

(i)     At the time of filing a motion(s) for distribution, I will simultaneously file objections to claims (or parts thereof), or a request for an extension of time to file any such objections, if additional information is needed;

(ii)    The motion(s) for distribution, the objections, and/or counterclaims will be served on the claimants by me at the address on the claim form submitted by the claimant, by U.S. Mail (foreign claimants will be served by DHL);

(iii)   The holders of "allowed claims"[17] will be paid by me upon an Order from this Court granting the recommended distribution. Payments by me will be made by check and must be cashed within ninety (90) calendar days, absent which the check will be voided, the uncashed checks will be deemed "unclaimed funds" available for distribution to other investors and creditors, and the claim will be deemed expunged and waived. I will be authorized to withhold issuing checks for future distributions to claimants who have not cashed checks from a prior distribution[18];

(iv)    The holders of claims to which I have objected, in whole or in part, will have forty-five (45) calendar days from the date of service of the objections within which to cure the deficiency and/or to respond to me in writing. Such written responses will be served by facsimile, email, or U.S. Mail on me at my office, c/o Ana Salazar, Receivership Administrator, at Levine Kellogg Lehman Schneider + Grossman LLP, 201 South Biscayne Boulevard, 34th Floor, Miami, FL 33131. If a claimant adequately and timely cures the deficiency or objection, or otherwise settles with me, I will deem the clamant a holder of an "allowed claim" and will immediately pay the claimant his or her distribution amount without further Order from this Court. If a claimant responds and does not adequately cure, the claimant's claim will be subject to the Objection Procedure as a "disputed claim."[19] If a claimant does not respond within

---

[17] "Allowed claims" include: (1) the claimants who timely filed claims to which I have no objections, and thus did not file objections; (2) the claimants who timely responded to my objection, but whose claim has been resolved in accordance with my recommended treatment in the Objection or through settlement; (3) the claimants who did not timely respond to my objection, but whose claim shall be allowed in accordance with my recommended treatment in the Objection; and (4) the claimants who filed late claims to which I have no objections.

[18] I requested permission to use my discretion to reissue checks to claimants who fail to timely cash checks for equitable reasons, such as if a claimant passes away, if a claimant moves or if I determine a new address should be used. I also requested permission to issue and/or reissue checks to a deceased claimant's estate if satisfactory proof has been provided.

[19] "Disputed claims" will, therefore, include the claimants who timely responded to the my objection but who disagree with my recommended treatment or claimants who did not cure their deficiencies.

the time provided, my objections will be deemed sustained and adjudicated with prejudice, and the claim will be treated in accordance with my objections. I will file periodic status reports with this Court as to claimants who have cured (and who have been paid their distribution amount), claimants who have responded but have not adequately cured (*i.e.*, "disputed claims"), and claimants who have not responded in any manner (and whose claim will be treated in accordance with my objections)[20];

(v)     After a response is served in writing on me, the claimant and I will have ninety (90) calendar days to conduct any necessary discovery and file any dispositive motions in regards to the objections for the "disputed claim." Pursuant to the executed proof of clam forms, claimants have already submitted to the exclusive jurisdiction of this Court, and have waived the right to a jury trial, for purposes of any objections; therefore, any necessary discovery and/or dispositive motions in regards to objections will be conducted and resolved by this Court in a summary proceeding. All depositions will be conducted at my office: Levine Kellogg Lehman Schneider + Grossman LLP, 201 South Biscayne Boulevard, 34th Floor, Miami, FL 33131;

(vi)    At the conclusion of the foregoing discovery period (or, if extended, such extended period), I will provide the Court with a status report(s) regarding the objections, and also move for a Scheduling Order detailing the process for adjudication by this Court of any objections at issue for "disputed claims"; and

(vii)   I will determine late claims on a case-by-case basis.

### 4.  The Claims and Requested Relief

As stated above, 1,020 claimants submitted claim forms to me. I have analyzed all of the claim forms. I have provided my recommended disposition of each claim – whether as an allowed claim or one to which I objected – on the Claim Matrix attached hereto and mailed to all known investors and creditors. The Claim Matrix lists each claimant's name in alphabetical order. The Claim Matrix also includes abbreviations for the names of the clubs to which the vast majority of claimants transferred their monies to be invested in Trade. If I did not object, the

---

[20] "Disallowed claims" will likely include the claimants who did not timely respond to my objection, and whose claims should be disallowed in accordance with my recommended treatment in the Objection.

claim is an "allowed claim" and processed in accordance with the above Court-approved procedures [DE 130 and DE 133]. If I objected, the claim will be subject to the above Court-approved Objection Procedure [DE 130 and DE 133].

Many claim forms had some type of deficiency, many of which have been, and should be easily, cured by the claimant (such as signing the claim form, providing proof of identity, agreeing to my recommended claim amount or producing the requested records). Once the deficiency has been cured, the claimant will have an "allowed claim." For this reason, I proposed the cure period (which this Court has approved).[21] In short, I am hopeful that, after the cure period, there will be very few "disputed claims."

Moreover, as stated above, I mailed a copy of the Claim Matrix to each investor and creditor, and simultaneously provided a cover letter explaining in "plain English" the distribution and objection procedures, so the investors and creditors understand what to do and how to do it. A copy of the cover letter is attached as Exhibit B. I also updated the claimants by posting the distribution motion and Claim Matrix on the receivership website (www.tradereceiver.com), as well as updating the "Recent News" section of the website (I have previously updated investors, on a repeated basis, regarding the claims process by posting on the website relevant filings, posting letters to investors, and updating the "Recent News" section).

## III.   Marshaling of the Receivership Entities' Assets

As stated previously, the various receivership Orders in the SEC and the CFTC actions grant me title to receivership assets by operation of law and, therefore, entitle me to the immediate turnover of receivership assets wherever located. These receivership assets will

---

[21] Some investors did not include the bank records confirming their investment, but most of those deficiencies regarding the claim amount were cured by me, when I assembled the bank records to track each investor's investment.

ultimately be liquidated for the benefit of the hundreds of defrauded investors who will be repaid in interim distributions through a Court-approved claims process.

### A. The Properties

#### 1. Midtown Unit 3117

Milton and Center, through CMJ Capital, purchased units 3117 and 3317 at the Residences at Midtown in Palm Beach Gardens for approximately $295,000 of investor-derived funds. I sold unit 3317 in February 2011. The closing for unit 3117 in the amount of $142,500.00 occurred on August 26, 2011.

#### 2. Midtown Unit 2305

I discovered that, soon before it shut down, Trade transferred $200,000.00 of investor funds to a Trade-insider and a close Milton-friend, Darren Jarema ("Jarema"), for him to purchase a condominium in the Residences at Midtown (the same development where Milton and Center, through CMJ Capital, had purchased the two above condominiums); Jarema's condominium is unit 2305. There is no mortgage on this property.

I sued Jarema for, among other things, a constructive trust and/or equitable lien on this property. I took Jarema's deposition in January 2011, in which he admitted that – based on his desire to own a home and move out of his grandmother's residence, and based on his request to Milton that Milton take "care of him" so he could purchase his own home – Milton transferred $200,000.00 to him from Trade, so he could purchase the condominium. Jarema then wired $30,000.00 of the $200,000.00 back to Milton the next day, as Milton was a prolific "mover" of money. I moved for summary judgment to take title to this property, after which Jarema agreed to deed the property to me in full settlement of my claims.

I have insured, have changed the locks, have retained a realtor to market, and have signed

a contract to sell this property for $160,000.00. I have moved for confirmation of this sale, which this Court granted. The closing is expected to occur by the end of November.

### 3.  8143 Greystone East Circle

As stated previously, Center used at least $210,000 of investor funds to renovate his home in Richmond, Virginia. I filed and recorded a lis pendens in Virginia on Center's home so it cannot be sold or further encumbered. I hope to settle my claim as to Center's home improvements in the near future. In addition to using investor funds to renovate his home, Center used at least $92,000 in investor funds to re-furnish his newly-renovated home. I have obtained a list of items that Center purchased from the interior design company to determine what furniture and furnishings should be turned over to me. I intend to obtain and sell these items for the benefit of the receivership estate.

### B.  Furniture, Fixtures, and Equipment

There is at least one remaining piece of artwork and a generator system from the 19 Blenheim property that will be sold or auctioned in the near future.

Regarding the remaining furniture, fixtures and equipment which was previously located in Trade's office in Richmond, Virginia (which Center ran), Center allegedly sold nearly all the furniture, fixtures, and equipment pre-receivership. I am still investigating this issue.

### C.  Bank and Brokerage Accounts

I previously obtained frozen balances in various accounts, the largest balances of which ranged from approximately $113,000 to approximately $50,000. Like the $6.4 million that I initially secured, these funds have been deposited into my protected receivership accounts.

### D.  Personal Items

Milton and the Centers (William and Gregory) signed a Stipulation with me in which

they agreed to list – in a formal sworn accounting – all of their personal items, whether purchased with Trade-derived funds or not, and to produce documents substantiating the information. The items purchased with Trade-derived funds will be turned over to me, after which I will sell these items for the benefit of the receivership estate. The Stipulation corrected the provision in the receivership Orders issued in the CFTC action that required me to take possession of literally every item owned by or purchased by the Defendants. This Court entered an Order approving the Stipulation [DE 39]. Milton and the Centers have provided the Court-ordered sworn accountings to me, which I have evaluated. The accountings are deficient in several respects and/or raise questions which require further investigation. I will attempt to resolve these issues with Milton and the Centers in the near future, absent which I will seek relief from this Court.

In addition, I sold jewelry secured from Milton and another profiteer of the fraud for $6,500.00.

## IV.    Filing Lawsuits against Third Parties Who Received the Fruits of the Fraud

Since my last Report, I have filed a sixth lawsuit and have finished resolving my five initial lawsuits against Milton, Center, and several other insiders, entities and/or individuals that received hundreds of thousands of dollars from Trade. The new lawsuit is *Jeffrey C. Schneider, Receiver v. Silent Standby Power Supply LLC, Franklin Freedman, and Siri Salmi*, Case No. 11-80977. That lawsuit was originally pending before the Honorable Donald Middlebrooks and has been transferred to this Court [DE 18] in response to my Notice of Pending, Refiled, Related, or Similar Action [DE 6], in which I requested that the case be transferred to this Court, which has presided over the pending Securities and Exchange Commission enforcement action and my five prior ancillary receivership lawsuits. The five initial lawsuits were:

1. *Jeffrey C. Schneider, Receiver v. Philip W. Milton, William H. Center, T & D Highway Services LLC, Dawn Peluso, Charles Reeves, Jason Zamperini, Timothy O'Connor, David R. Casazza, Konstantina Casazza, Dennis Sacco, and Roseann Sacco*, Case No. 10-61401 **(now settled)**[22];

2. *Jeffrey C. Schneider, Receiver v. Trinity United Methodist Church of Palm Beach Gardens*, Case No. 10-80941 **(previously settled)**;

3. *Jeffrey C. Schneider, Receiver v. Darren Jarema and Jarema Financials Inc.*, Case No. 10-80939 **(previously settled)**;

4. *Jeffrey C. Schneider, Receiver v. MC Building Consultants LLC, Impact Self-Storage LLC, Charles Reeves, and Marisa Reeves*, Case No. 10-80956 **(now settled)**[23]; and

5. *Jeffrey C. Schneider, Receiver v. William Jordan*, Case No. 10-80955 **(final default judgment)**.[24]

I continue to remain hopeful that, rather than engage in costly and protracted litigation, I will be in a position to consensually resolve the remaining lawsuit in the coming months. If I am unable to consensually resolve it, I will take the necessary discovery and move for summary judgment, because the issues (in my view) are quite clear.

I may file additional lawsuits in the future against other potential targets.

## V.     Discovery

I have noticed Mindy Baransky, the principal of the Jool Club, for deposition on November 16, 2011. I am continuing to evaluate whether to depose other individuals, including certain friends and family members of Milton and Center.

I have continued to serve additional subpoenas on various banks, brokerage firms, persons, and entities that have relevant information in the receivership.

---

[22] I settled with all remaining defendants – Charles Reeves, Philip Milton, William Center, Jason Zamperini, and Timothy O'Connor.

[23] I settled with all remaining defendants – Charles and Marisa Reeves.

[24] I obtained a Final Default Judgment against Jordan for $87,100.00.

## VI.   Miscellaneous Issues

In September 2011, I filed tax returns for all five Receivership Entities (I had previously obtained an extension).

On another note, A.J. Watson, the apparent mastermind behind CFF, pled guilty to one count of wire fraud on September 22, 2011.  The criminal case was filed by the U.S. Attorney in the Eastern District of Virginia.  Mr. Watson's sentencing is scheduled for December 9, 2011.  A copy of the indictment and plea agreement is attached as Exhibit C.

## VII.   Conclusion

I continue, and will continue, to: (1) protect the millions of dollars in assets that I have previously secured; (2) repay defrauded victims; (3) conclude lawsuits; (4) uncover improper transactions about which I will file motions or lawsuits; and (5) take depositions of relevant individuals.

I look forward to continuing to carry out my Court-obligated duties at the highest level possible for the benefit of the victims of this unfortunate fraud.

_____
Jeffrey C. Schneider, Receiver

Dated: November __4__, 2011