IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 10-CV-80737-HURLEY/HOPKINS
(Consolidated with Case No. 10-CV-80738-HURLEY/HOPKINS for the Receivership)

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,
Plaintiff,

v.

TRADE-LLC, et al.,
Defendants,

v.

BD LLC, et al.,
Relief Defendants.
_____/

COMMODITY FUTURES TRADING
COMMISSION,
Plaintiff,

v.

TRADE-LLC, et al.,
Defendants,

BD LLC, et al.,
Relief Defendants.
_____/

## NOTICE OF FILING

Jeffrey C. Schneider, not individually, but solely in his capacity as the court-appointed receiver (the "Receiver") for Trade-LLC, BD LLC, TWTT-LLC, CMJ Capital LLC, and Center Richmond LLC, hereby files the attached Sixth Report of Receiver dated March 26, 2012.

Dated: March 26, 2012

Respectfully submitted,

LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
Counsel for the Receiver
201 South Biscayne Boulevard
34th Floor, Miami Center
Miami, Florida 33131
Telephone: (305) 403-8788
Facsimile: (305) 403-8789

By: s:/Patrick J. Rengstl
 Patrick J. Rengstl, Esq.
 FL Bar No. 0581631

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s:/Patrick J. Rengstl
Patrick J. Rengstl, Esq.

## SERVICE LIST

**Patrick J. Rengstl, Esq.**
Attorney for Receiver
LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
201 South Biscayne Blvd.
34th Floor, Miami Center
Miami, Florida 33131
Telephone: 305.403.8788
Facsimile: 305.403.8789

**James D. Sallah, Esq.**
Former Attorney for Trade-LLC, BD LLC,
CMJ Capital LLC, and TWTT-LLC
SALLAH & COX LLC
Boca Corporate Center
2101 N.W. Corporate Blvd., Suite 218
Boca Raton, Florida 33431

**Christopher Bruno, Esq.**
Attorney for Defendant William H. Center
and Gregory Center
BRUNO & DEGENHARDT
10615 Judicial Drive, Suite 703
Fairfax, VA 22030

**Jason Mahoney, Esq.**
Attorney for COMMODITY FUTURES TRADING
COMMISSION
1155 21st Street, N.W.
Washington, DC 20581
Direct: (202) 418-5289

**Christopher E. Martin, Esq.**
**Susan E. Curtin, Esq.**
Attorney for Plaintiff
SECURITIES & EXCHANGE COMMISSION
Miami Regional Office
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: 305.983.6386
Facsimile: 305.536.4154
Email: martinc@sec.gov
Email: curtins@sec.gov

**Lawrence U. Taube, Esq.**
Attorney for Defendant Philip W. Milton
LAW OFFICES OF LAWRENCE U TAUBE
500 South Australian Avenue, Suite 630
West Palm Beach, Florida 33401

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 10-CV-80737-HURLEY/HOPKINS
(Consolidated with Case No. 10-CV-80738-HURLEY/HOPKINS for the Receivership)

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,
Plaintiff,

v.

TRADE-LLC, et al.,
Defendants,

v.

BD LLC, et al.,
Relief Defendants.
_____/

COMMODITY FUTURES TRADING
COMMISSION,
Plaintiff,

v.

TRADE-LLC, et al.,
Defendants,

BD LLC, et al.,
Relief Defendants.
_____/

## SIXTH REPORT OF RECEIVER JEFFREY C. SCHNEIDER

Jeffrey C. Schneider, not individually, but solely in his capacity as receiver (the "Receiver") for Trade-LLC, BD LLC, TWTT-LLC, CMJ Capital LLC, and Center Richmond LLC (collectively, the "Receivership Entities" or "Trade"),[1] submits this Sixth Report.

---

[1] The Commodity Futures Trading Commission (the "CFTC") enforcement action (Case No. 9:10-CV-80738) has been transferred to this Court and its receivership proceeding has been consolidated.

I.      **General Overview**

I am pleased to advise this Court that, since my last Report dated November 4, 2011, I have completed the first distribution to all of the claimants with "allowed claims" and all of the claimants who cured any claim deficiencies. The distribution was approximately 25% of investor losses.[2] And the proposed cure period, which was self-executing, worked efficiently as planned and helped to cure the majority of the initially deficient claims, which then allowed me to issue distribution checks promptly without further Court Order or delay.

For example, many claimants neglected to provide a copy of their driver's license or Passport when they submitted their claim form. After receiving the Claim Matrix, many then provided such a copy, and because they cured their claim deficiency, I accepted their claim and issued them a distribution check without further Court Order or delay. Similarly, I objected to claims in which my recommended claim amount differed from the claimant's. In response, many of these claimants confirmed in writing that they agreed with my recommended claim amount or provided the necessary records, and I then issued them a distribution check. The cure period ended on December 5, 2011, and the majority of the claimants with initially deficient claims cured any claim deficiencies through that date.

Moreover, as an example of one of the more complex claims, there was one claimant whose investment had allegedly been transferred through one intermediary before being transferred to one of Trade's investment clubs (a second intermediary), and then to Trade. That claimant had allegedly made a six-figure investment, so the claim was one of the larger in the estate. However, that claimant did not have the necessary records to prove that his investment was transferred to Trade, and the first intermediary was not cooperating with me (or the

---

[2] There were **1,020** proof of claim forms submitted by investors.

claimant) to provide the necessary bank records to track the investment. Therefore, I undertook the process of obtaining the first intermediary's bank records through subpoena and forensically analyzing them to track the alleged investment. Because of my undertaking, I was able to confirm the legitimacy of the six-figure investment for the benefit of this claimant, after which I deemed the claim as "allowed" and issued him a distribution check.

In addition to issuing distribution checks, my professionals and I have addressed accounting issues to ensure that the first distribution complies with IRS requirements. For example, many investors invested through an IRA or other qualified retirement account. This required me to timely issue a Form1099-R. These were complicated issues that caused a tremendous amount of confusion, particularly for those investors that intended to "roll-over" their distribution checks.

In addition to dealing with the claims and distribution process, which has occupied the vast majority of our time the last several months, I have also, since my last Report, closed the sale of insider Darren Jarema's condominium for **$160,000.00**, a receivership asset that I secured as part of my litigation against him.[3] I have also continued to receive settlement checks on a monthly basis from prior Court-approved settlements.

I continue to update investors on the receivership website (www.tradereceiver.com) by posting letters to investors when appropriate. I also continue to post relevant filings from the enforcement and ancillary receivership lawsuits on the website.

The purpose of this Report is to more specifically advise this Court and other interested parties as to the material actions that I have taken since my last Report dated November 4, 2011, which, among other things, include:

---

[3] This Court confirmed the sale of this property [DE 145 and 146].

- Distributions

- Marshaling of the Receivership Entities' assets

- Filing lawsuits against third parties who received the fruits of the fraud

- Discovery

I am hopeful, if all goes as planned, to make a final distribution by the Summer or Fall of this year and then close the receivership.

## II. Distributions

### A. The First Distribution

I have completed issuing my first distribution to claimants with "allowed claims." Many claim forms had some type of deficiency, many of which were easily cured by the claimant (such as signing the claim form, providing proof of identity, agreeing to my recommended claim amount or producing the requested records). Once the deficiency was cured, the claimant automatically had an "allowed claim" under the protocol that I developed and this Court approved.[4] In short, and as I hoped for, there were very few "disputed claims" after the cure period expired.

Each first distribution check was approximately 25% of the claimant's allowed claim amount. In other words, if the allowed claim was $10,000, then the first distribution check was approximately $2,500. The reason for this was that a large proportion of the funds deposited with Trade were used, diverted, or misappropriated in the Trade Ponzi scheme. The formula, which this Court approved, for calculating the first distribution check was as follows: the amount of the allowed claim divided by the total amount of filed claims as of the first distribution

---

[4] Some investors did not include the bank records confirming their investment, but most of those deficiencies regarding the claim amount were cured by me, when I assembled the bank records to track each investor's investment.

($22,333,684.84), multiplied by the proposed distribution amount ($5,500,000.00).

I will be making another – and, probably, final – distribution, but it is expected to be for a smaller percentage. I am hoping to make that distribution by the Summer or Fall of 2012, after I resolve pending litigation issues with the remaining receivership targets.

**B. Form 1099-R**

I conferred on several occasions with my tax professionals to comply with IRS requirements for issuing the first distribution. If the claimant did not invest through a qualified retirement account, or an IRA, the claimant did not receive a Form 1099. If the investment was through an IRA, however, the distribution had to be reported on a Form 1099-R, *Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.*

I informed claimants that when a distribution is made directly to a beneficiary (or investor), the beneficiary likely has 60 days to roll-over the funds into another IRA account to avoid a tax and/or a penalty on an early distribution. Because I am not an IRA custodian, I could not re-issue distribution checks to a claimant's account. Therefore, I informed claimants that if he or she wanted to fund his or her IRA account, then he or she should send the funds from the distribution check to the IRA account as soon as possible. I also informed claimants to discuss immediately their specific situation with their tax advisor regarding how this rule may apply to them.

**C. Late Claims**

I received several late claims which I will be analyzing. I will then recommend to this Court what procedure should apply to the late claims. This Court previously granted me the discretion to determine late claims on a case-by-case basis. I am hopeful that there will not be any claims that are rejected because they were late.

### D. Disputed Claims

In addition, there are several claimants who have disagreed with my objection to their claim. I have termed these claims as "disputed claims."[5] The claimant and I had ninety (90) calendar days from their response to my objection to conduct any necessary discovery and/or file any dispositive motions in regards to the objections for the "disputed claim."

Pursuant to the executed proof of claim forms, claimants submitted to the jurisdiction of this Court, and waived the right to a jury trial, for purposes of any objections; therefore, any necessary discovery and/or dispositive motions in regards to objections will be conducted and resolved by this Court in a summary proceeding. If I am unable to resolve my objection, I have had no choice but to file a motion for summary disposition for this Court to sustain my objection. Those motions for summary disposition involved Jool Club claimants whose funds were not transferred to Trade [DE 151 and 153]. I provided notice of the motions to the affected disputed claimants and filed their responses for this Court's consideration. This Court recently granted the motions for summary disposition [DE 163].

I have not needed to file additional motions for summary disposition regarding other disputed claimants because I was able to resolve my objections with them.

Pursuant to this Court's Order approving the distribution and objections procedures [DE 133], if a claimant did not timely respond to my objection, the objection was deemed sustained and adjudicated with prejudice, and the claim was to be treated in accordance with my objections. I will soon be filing a status report as to claimants who have cured (and who have been paid their distribution amount), claimants who have responded but have not adequately cured (*i.e.*, "disputed claims"), claimants who had a "disputed claim" but with whom I have

---

[5] "Disputed claims" include the claimants who responded to my objection but disagreed with my recommended treatment.

settled (and who have been paid their agreed-upon distribution amount), and claimants who have not responded in any manner (and whose claim will be treated in accordance with my objections).[6]

### III. Marshaling of the Receivership Entities' Assets

As stated previously, the various receivership Orders in the SEC and the CFTC actions grant me title to receivership assets by operation of law and, therefore, entitle me to the immediate turnover of receivership assets wherever located. These receivership assets have been and will ultimately be liquidated for the benefit of the hundreds of defrauded investors who will be repaid through the distribution process described above.

#### A. The Properties

##### 1. Midtown Unit 2305

I discovered that, soon before it shut down, Trade transferred $200,000.00 of investor funds to a Trade-insider and a close Milton-friend, Darren Jarema ("Jarema"), for him to purchase a condominium in the Residences at Midtown (the same development where Milton and Center, through CMJ Capital, had purchased two condominiums); Jarema's condominium was unit 2305. There was no mortgage on this property.

I sued Jarema for, among other things, a constructive trust and/or equitable lien on this property. I moved for summary judgment to take title to this property, after which Jarema agreed to deed the property to me in full settlement of my claims.

I signed a contract to sell this property for $160,000.00. I then moved for confirmation of this sale, which this Court granted. The closing occurred on December 1, 2011.

---

[6] "Disallowed claims" will likely include the claimants who did not timely respond to my objection, and whose claims should be disallowed in accordance with my recommended treatment in the objection.

### 2. 8143 Greystone East Circle

During the period, I moved to compel Defendant William Center ("Center") to provide dates on which my appraiser can inspect and appraise his home. Center used at least $210,000 of investor funds to completely renovate his home in Richmond, Virginia. As a result, I had filed and recorded a lis pendens in Virginia on Center's home so that it could not be sold or further encumbered.

I have retained an appraiser to inspect and perform an appraisal of the home to determine if there is any equity in the home. There is a mortgage on the property, as well as a tax lien. Since filing my motion to compel, Center, through counsel, has contacted my counsel and has made himself available for the inspection and appraisal. I am awaiting the appraisal report. Assuming there is sufficient equity in the home, I hope to settle my claim as to Center's home improvements in the near future.

In addition to using investor funds to renovate his home, Center used at least $92,000 in investor funds to re-furnish his newly-renovated home. I have obtained a list of items that Center purchased from the interior design company to determine what furniture and furnishings should be turned over and liquidated. I intend to obtain as many of these items as possible and, assuming they still have value, sell them for the benefit of the receivership estate.

### B. Furniture, Fixtures, and Equipment

There is at least one remaining piece of artwork, jewelry, and a generator system from the 19 Blenheim property. Assuming they still have value, they will be sold or auctioned in the near future. The jewelry consists of a watch secured from the settlement with insider Charles Reeves (I filed a motion to liquidate, which this Court recently granted [DE 156 and 158]).

Regarding the remaining furniture, fixtures and equipment which was previously located

in Trade's office in Richmond, Virginia (which Center ran), Center allegedly sold nearly all the furniture, fixtures and equipment pre-receivership. I am still investigating this issue.

### C. Bank and Brokerage Accounts

I previously obtained frozen balances in various accounts, the largest balances of which ranged from approximately $113,000 to approximately $50,000. Like the $6.4 million that I initially secured, these funds have been deposited into my protected receivership accounts.

### D. Personal Items

Milton and the Centers (William and Gregory) signed a Stipulation with me in which they agreed to list – in a formal sworn accounting – all of their personal items, whether purchased with Trade-derived funds or not, and to produce documents substantiating the information. The items purchased with Trade-derived funds will be turned over to me, after which I will sell these items for the benefit of the receivership estate. The Stipulation corrected the provision in the receivership Orders issued in the CFTC action that required me to take possession of literally every item owned by or purchased by the Defendants. This Court entered an Order approving the Stipulation [DE 39]. Milton and the Centers have provided the Court-ordered sworn accountings to me, which I have evaluated. The accountings are deficient in several respects and/or raise questions which require further investigation. I will attempt to resolve these issues with Milton and the Centers in the near future, absent which I will seek relief from this Court.

### IV. Filing Lawsuits against Third Parties Who Received the Fruits of the Fraud

There is currently only one remaining lawsuit pending against a target that improperly received hundreds of thousands of dollars from Trade. The lawsuit is *Jeffrey C. Schneider, Receiver v. Silent Standby Power Supply LLC, Franklin Freedman, and Siri Salmi*, Case No. 11-

80977. That lawsuit has been transferred to this Court. I continue to remain hopeful that, rather than engage in costly and protracted litigation, I will be able to consensually resolve this lawsuit in the coming months. If I am unable to consensually resolve it, I will take the necessary discovery and move for summary judgment, because the issues (in my view) are quite clear.

I have previously obtained several judgments against Trade's insiders and profiteers, such as Charles Reeves, Philip Milton, William Center, Timothy O'Connor, and William Jordan. I have recorded those judgments and am exploring collection efforts. I also continue to receive settlements payments from other prior targets, such as Jason Zamperini, RoadSafe (which acquired T&D), and David and Konstantina Casazza.

I may file additional lawsuits in the future against other potential targets.

### V. Discovery

I had no choice but to object to the claims of several Jool Club claimants whose funds were not transferred to Trade (the last transfer from Jool Club to Trade was <u>July 9, 2009</u>). I have tried to help these Jool Club claimants by trying to determine where Jool Club sent the money received after July 9, 2009. I served a subpoena on Jool Club's owner, Mindy Baransky, and attempted to take her deposition on November 22, 2011. She refused to appear and indicated that she would be asserting her Fifth Amendment Right against self-incrimination. I also subpoenaed Jool Club's bank records and discovered that at least $1 million was sent offshore to an account in Honk Kong. I consulted with an investigator and an offshore attorney, but the cost of pursuing the funds was unfortunately cost-prohibitive. I have also corresponded, and spoken, with the CFF Receiver regarding whether there is any forensic connection between CFF and the Jool Club, which – if it existed – would be a potential avenue for them recovering a part of their funds. I, of course, have also met with, and spoken to, the Federal authorities.

### VI. Miscellaneous Issues

A.J. Watson, the apparent mastermind behind Cash Flow Financial, previously pled guilty to one count of wire fraud. Watson has received a postponement of his sentencing hearing previously scheduled for December 2011. The sentencing was initially continued to March 2, 2012, and has been continued a second time to May 23, 2012.

### VII. Conclusion

I look forward to continuing to carry out my Court-obligated duties at the highest level possible for the benefit of the victims of this unfortunate fraud.

As stated above, I am hopeful, if all goes as planned, to make a final distribution by the Summer or Fall of this year and then close the receivership.

_____
Jeffrey C. Schneider, Receiver

Dated: March 26, 2012

FP4047