IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 10-CV-80737-HURLEY/HOPKINS
(Consolidated with Case No. 10-CV-80738-HURLEY/HOPKINS for the Receivership)

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,
Plaintiff,

v.

TRADE-LLC, et al.,
Defendants,

v.

BD LLC, et al.,
Relief Defendants.
_____/

COMMODITY FUTURES TRADING
COMMISSION,
Plaintiff,

v.

TRADE-LLC, et al.,
Defendants,

BD LLC, et al.,
Relief Defendants.
_____/

## NOTICE OF FILING

Jeffrey C. Schneider, not individually, but solely in his capacity as the court-appointed receiver (the "Receiver") for Trade-LLC, BD LLC, TWTT-LLC, CMJ Capital LLC, and Center Richmond LLC, hereby files the attached Seventh Report of Receiver dated August 23, 2012.

Dated: August 23, 2012

Respectfully submitted,

LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
Counsel for the Receiver
201 South Biscayne Boulevard
22nd Floor, Miami Center
Miami, Florida 33131
Telephone: (305) 403-8788
Facsimile: (305) 403-8789

By: s:/Patrick J. Rengstl
    Patrick J. Rengstl, Esq.
    FL Bar No. 0581631

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s:/Patrick J. Rengstl
Patrick J. Rengstl, Esq.

## SERVICE LIST

**Patrick J. Rengstl, Esq.**
Attorney for Receiver
LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
201 South Biscayne Blvd.
22nd Floor, Miami Center
Miami, Florida 33131
Telephone: 305.403.8788
Facsimile: 305.403.8789

**James D. Sallah, Esq.**
Former Attorney for Trade-LLC, BD LLC,
CMJ Capital LLC, and TWTT-LLC
SALLAH & COX LLC
Boca Corporate Center
2101 N.W. Corporate Blvd., Suite 218
Boca Raton, Florida 33431

**Christopher Bruno, Esq.**
Attorney for Defendant William H. Center
and Gregory Center
BRUNO & DEGENHARDT
10615 Judicial Drive, Suite 703
Fairfax, VA 22030

**Jason Mahoney, Esq.**
Attorney for COMMODITY FUTURES TRADING
COMMISSION
1155 21st Street, N.W.
Washington, DC 20581
Direct: (202) 418-5289

**Christopher E. Martin, Esq.**
**Susan E. Curtin, Esq.**
Attorney for Plaintiff
SECURITIES & EXCHANGE COMMISSION
Miami Regional Office
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: 305.983.6386
Facsimile: 305.536.4154
Email: martinc@sec.gov
Email: curtins@sec.gov

**Lawrence U. Taube, Esq.**
Attorney for Defendant Philip W. Milton
LAW OFFICES OF LAWRENCE U TAUBE
500 South Australian Avenue, Suite 630
West Palm Beach, Florida 33401

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 10-CV-80737-HURLEY/HOPKINS
(Consolidated with Case No. 10-CV-80738-HURLEY/HOPKINS for the Receivership)

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,
Plaintiff,

v.

TRADE-LLC, et al.,
Defendants,

v.

BD LLC, et al.,
Relief Defendants.
_____/

COMMODITY FUTURES TRADING
COMMISSION,
Plaintiff,

v.

TRADE-LLC, et al.,
Defendants,

BD LLC, et al.,
Relief Defendants.
_____/

## SEVENTH REPORT OF RECEIVER JEFFREY C. SCHNEIDER

Jeffrey C. Schneider, not individually, but solely in his capacity as receiver (the "Receiver") for Trade-LLC, BD LLC, TWTT-LLC, CMJ Capital LLC, and Center Richmond LLC (collectively, the "Receivership Entities" or "Trade"),[1] submits this Seventh Report.

---

[1] The Commodity Futures Trading Commission (the "CFTC") enforcement action (Case No. 9:10-CV-80738) has been transferred to this Court and its receivership proceeding has been consolidated.

I.      **General Overview**

I am pleased to advise this Court that I recently moved for authority to make my second and final distribution in the amount of $1,783,000 [DE 173], which will allow me to close the receivership in the next few months. The final distribution will be approximately 9% of investor losses. The first distribution was approximately 25% of investor losses.[2] Therefore, I will be returning approximately 34% in total to investors in this receivership in approximately two years. The motion for final distribution also resolved other claim issues, such as the claimants with late claims. The motion for final distribution is further described below.

I have also settled the final receivership lawsuit – *i.e.*, the Silent Standby case – in which the estate will receive $50,000 and two judgments against Silent Standby totaling $200,000. Similarly, I have continued to receive settlement checks on a monthly basis from prior Court-approved settlements.

In the next two to three months, I plan to: (1) issue the distribution checks, as permitted in the motion for final distribution; (2) issue 1099's to investors; (3) prepare and file tax returns for the Receivership Entities; and (4) complete certain miscellaneous receivership work to wind-down the case.

I continue to update investors on the receivership website (www.tradereceiver.com) by posting letters to investors when appropriate. I also continue to post relevant filings from the enforcement and ancillary receivership lawsuits on the website.

The purpose of this Report is to more specifically advise this Court and other interested parties as to the material actions that I have taken since my last Report dated March 26, 2012, which, among other things, include:

---

[2] My first distribution was in the amount of $5.5 million and made in November 2011 [DE 136].

- Distributions

- Marshaling of the Receivership Entities' assets

- Filing lawsuits against third parties who received the fruits of the fraud

I am hopeful, if all goes as planned, to close the receivership in the next two to three months.

## II. Distributions

### A. The Final Distribution

I have moved for Court-approval to make a final distribution of $1,783,000, which represents approximately a 9% distribution. I plan to keep a reserve of $40,000 to cover the expenses of issuing 1099's, filing tax returns, enforcing outstanding settlements, and winding-down the estate.[3]

I previously filed a motion delineating the distribution procedures [DE 130], which this Court approved [DE 133]. Below is a summary of the Court-approved procedures.

I was authorized to make distributions on a pro-rata basis based on the investor's or creditor's proportionate share of the total amounts invested by or owed to all investors and creditors in Trade. The claim amount for each investor was a *net* claim amount, which represents all amounts invested by that investor subtracted by all amounts received by that investor (pre-receivership or post-receivership).

At the same time, I determined the total dollar amount of all investments into, and other claims against, Trade (the "Investment Claim Total"). For purposes of the final distribution, the Investment Claim Total is $20,248,773.88. It is a different amount than the Investment Claim

---

[3] Depending on judgments I am holding, it is possible that I will collect additional amounts in the future and move to reopen the case to make another distribution. Unfortunately, however, I do not hold out much hope that the judgments are collectible. The details of those judgments will be discussed in my Final Report.

3

Total associated with the first distribution (which was $22,333,684.84), because: (1) the "disallowed claims" have been removed (which has reduced the number); (2) certain claimants with claims to which I objected agreed with my proposed claim amount (which has, in most instances, reduced the number); and (3) the late claims have been included (which has increased the number). Like the first distribution, I have determined a percentage that corresponds to each investor's (or creditor's) share of the Investment Claim Total (the "Investment Claim Percentage").[4]

Like the first distribution, each "allowed" claimant has received and/or will receive a fixed percentage of his/her "allowed claim" from the proposed distribution amount, based on the following formula: the amount of the *net* "allowed claim" divided by the total amount of filed claims multiplied by the proposed distribution amount.

### B. Late Claims

I received several claims after filing the motion for first distribution. I designated these as "late claims." In total, I received 10 late claims, which I have since analyzed. The claims procedure permitted me to address late claims on a case-by-case basis.

I reached an agreement with the majority of late claimants on his/her respective claim amount, which is reflected in the Late Claim Matrix attached as Exhibit C to the motion for final distribution. All but two late claimants have "allowed claims"; the other two have claims to which I objected. I requested that this Court rule on, and sustain, my two objections after the briefing of the motion for final distribution is complete.

I am able to issue distribution checks – as part of the first distribution – to the late

---

[4] For example, if the Investment Claim Total was $50 million, and John Smith invested $5 million, then John Smith's Investment Claim Percentage would be 10% of the Investment Claim Total.

4

claimants with "allowed claims," because there is enough in reserve from the "disallowed claims" from the first distribution. For example, the previously-requested claim amounts for "disallowed claims" total $1,004,380.19, so that amount is now left over to pay the late claimants with "allowed claims" (there is $207,580.21 in "allowed" late claims and $175,000.00 in disputed late claims to which I have objected). This surplus has permitted me to move for authority to make a "catch-up" first distribution to those late claimants with "allowed claims" pursuant to the formula from the first distribution. <u>As such, no claims have been rejected because they were late</u>.

### C. Disallowed Claims

If I objected to paying a claim in the first distribution and that claimant did not respond to my objection, the objection was deemed sustained and the claim denied. These claims were called "disallowed claims." As part of the motion for final distribution, I requested that this Court formally disallow those claims in a Court Order. The "disallowed claims" were listed in the Disallowed Matrix attached as Exhibit B to the motion for final distribution.

### III. Marshaling of the Receivership Entities' Assets

As stated previously, the various receivership Orders in the SEC and the CFTC actions grant me title to receivership assets by operation of law and, therefore, entitle me to the immediate turnover of receivership assets wherever located. These receivership assets have been and will ultimately be liquidated for the benefit of the hundreds of defrauded investors who will be repaid through the distribution process described above.

### A. The Properties

Defendant William Center ("Center") used at least $210,000 of investor funds to renovate his home in Richmond, Virginia. As a result, I filed and recorded a lis pendens in Virginia on

Center's home so that it could not be sold or further encumbered. There is a mortgage on the property, as well as a tax lien.

I retained an appraiser to inspect and perform an appraisal of the home to determine if there is any equity in the home. Center ultimately made himself available for the inspection and appraisal. Since my last Report, I have received the appraisal report. I am still evaluating whether there is sufficient equity in the home to justify turnover to, and sale by, me.

In addition to using investor funds to renovate his home, Center also used at least $92,000 in investor funds to re-furnish his home. I obtained a list of items that Center purchased from the interior design company to determine what furniture and furnishings may be subject to turnover and liquidation. I am still evaluating those issues.

B. **Furniture, Fixtures, and Equipment**

There is at least one remaining piece of artwork, jewelry, some "Trade" signage, and a generator system from the 19 Blenheim property. Assuming they still have value that justifies the effort, they will be sold or auctioned in the near future. The jewelry consists of a watch secured from the settlement with insider Charles Reeves (I filed a motion to liquidate this item, which this Court granted [DE 156 and 158]). Any items that have insufficient value to justify sales efforts will be abandoned or given to charity.

C. **Bank and Brokerage Accounts**

I previously obtained frozen balances in various accounts, the largest balances of which ranged from approximately $113,000 to approximately $50,000.

D. **Personal Items**

Milton and the Centers (William and Gregory) signed a Stipulation with me in which they agreed to list – in a formal sworn accounting – all of their personal items, whether

purchased with Trade-derived funds or not, and to produce documents substantiating the information. The Stipulation corrected the provision in the receivership Orders issued in the CFTC action that required me to take possession of literally every item owned by or purchased by the Defendants. This Court entered an Order approving the Stipulation [DE 39]. Milton and the Centers have provided the Court-ordered sworn accountings to me, which I have evaluated. The accountings have raised questions which require further investigation. I expect to resolve these issues with Milton and the Centers in the near future.

### IV.    Filing Lawsuits against Third Parties Who Received the Fruits of the Fraud

As of my last Report, there was only one remaining lawsuit pending against a target that improperly received hundreds of thousands of dollars from Trade. The lawsuit is *Jeffrey C. Schneider, Receiver v. Silent Standby Power Supply LLC, Franklin Freedman, and Siri Salmi*, Case No. 11-80977. I recently settled that lawsuit and have moved for Court-approval [DE 33], which this Court granted [DE 34]. As stated above, pursuant to that settlement, the estate will receive $50,000 and two judgments against Silent Standby totaling $200,000.

I also moved – under seal – for a break order against Timothy O'Connor, who in April 2012 admitted to committing perjury at his deposition and lying to me (and Federal authorities) about receiving cash (literally) on the back-end of the T & D transaction. In my opinion, the most probable reason for O'Connor to lie about the cash was because O'Connor likely still had some or all of the cash. This Court granted the motion and issued a Sealed Order Granting Ex Parte Motion for Break Order in Aid of Execution (the "Break Order") against O'Connor.

On the morning of June 27, 2012, several United States Marshals officers, my counsel and I executed the Break Order and entered O'Connor's rental home to search for the cash that he had received from the Trade Ponzi scheme. (A witness advised me that O'Connor received

$165,000 in cash. O'Connor denied receiving any cash, both under oath and during several meetings with me and the authorities. O'Connor later admitted to receiving $39,000 in cash).

The Marshals officers entered the property from the back door, which had, surprisingly, been left unlocked. Therefore, the Marshals officers did not need to break down any doors to gain access to the property. The officers immediately searched the premises to confirm whether anybody was present. After confirming that no one was present, the Marshals officers opened the front door for me and my counsel to gain access to the property. My counsel and I then searched the entire home, backyard, and shed for several hours. Unfortunately, we did not locate the cash at the property.

Although I did not locate the cash, I did locate assets which O'Connor had failed to disclose to me and/or had lied about to me. In fact, these discoveries were shocking to me because O'Connor had always stated that he did not have anything of value and did not have any money to purchase anything of value. I, however, located a 100th anniversary Harley Davidson motorcycle in the driveway of the property. The motorcycle was registered to O'Connor in April 2012. Curiously, I met with O'Connor in April 2012, during which O'Connor was, again, asked if he had anything of value. The answer, again, was that he did not. In addition, I located new computer equipment (including lap tops), entertainment equipment (including an iPod), luggage, bicycles, and several paddleboards.

I have also continued to receive settlements payments from other prior targets, such as Jason Zamperini, RoadSafe (which acquired T&D), and David and Konstantina Casazza.

V. **Miscellaneous Issues**

A.J. Watson, the apparent mastermind behind Cash Flow Financial, previously pled guilty to one count of wire fraud in the criminal case against him. That case is pending in

8

Federal Court in Virginia. Mr. Watson's sentencing hearing was May 23, 2012, and the Court sentenced Mr. Watson to 12 years in prison.

## VI. Conclusion

I estimate that the receivership will conclude, and I will move to close the receivership, by the Fall of this year, which is when I am expected to receive a settlement payment from the final receivership lawsuit (*i.e.*, the Silent Standby case) and to conclude miscellaneous receivership issues (*i.e.*, issuing distribution checks as permitted in the motion for final distribution, issuing 1099's to investors, and preparing and filing tax returns).

I look forward to continuing to carry out my Court-obligated duties at the highest level possible for the benefit of the victims of this unfortunate fraud.

_____
Jeffrey C. Schneider, Receiver

Dated: August 23 2012

G52006